# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-DP-00441-SCT

*TERRY PITCHFORD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2006 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ALISON R. STEINER |
| | RAY CHARLES CARTER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PATRICK JOSEPH McNAMARA, JR. |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 06/24/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     Terry Pitchford and an accomplice killed a store-owner in Grenada County during the course of an armed robbery. Pitchford was indicted, tried, and convicted of capital murder, and the jury found that he should be executed by lethal injection. He appeals, raising for our review seventeen issues. Because we find no reversible error, we affirm the conviction and sentence.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. On the morning of November 7, 2004, Walter Davis and his son entered the Crossroads Grocery, where they discovered the body of the owner, Reuben Britt. They immediately called 911, and Grenada County Sheriff's Department Investigator Greg Conley responded.

¶3. During his initial investigation at the scene, Investigator Conley observed that some of Britt's wounds appeared to have been made by a projectile, and others by pellets, suggesting to Investigator Conley that two different weapons were involved. Missing from the store were a cash register, some cash, and a .38 caliber revolver loaded with "rat shot." Also during his initial investigation, Investigator Conley received information suggesting that a vehicle owned by Terry Pitchford matched the description of the car used by Britt's assailants, and that Pitchford had been part of a previous attempt to rob the Crossroads Grocery.

¶4. At Pitchford's home, Conley found a car matching the description of the one involved in the homicide at the Crossroad's grocery. After a search of the vehicle produced the missing .38 caliber revolver, Pitchford was taken into custody.

¶5. On November 7 and 8, 2004, Investigator Conley and Investigator Robert Jennings of the local district attorney's office interviewed Pitchford. During those interviews, Pitchford confessed that he and Eric Bullins had gone to the store with the intention of robbing it. Pitchford stated that Bullins had shot Britt three times with a .22 caliber pistol, and that he (Pitchford) had fired shots into the floor. Pitchford also confessed that he had attempted to rob the same store a week and a half prior to the murder on November 7.

2

Pitchford also confessed his role in the murders to fellow inmates Dantron Mitchell and James Hatchcock.

¶6. On January 11, 2005, the Grenada County Grand Jury indicted Pitchford for capital murder. After he was appointed counsel, he was arraigned on February 9, 2005, and jury selection commenced on February 6, 2006. Of the 350 registered voters of Grenada County who were summoned to a special venire, 126 returned jury questionnaires and appeared upon their summonses. Of these, forty were African-American, eighty-four were Caucasion, one was Hispanic, and one did not provide race information.

¶7. The trial judge (without objection from either party) excused certain jurors for statutory cause and other reasons unrelated to the case. At that point, the venire stood at ninety-six, of which thirty-five were African-American, and sixty-one were white. Following voir dire by the attorneys, the trial judge (without objection from either party) struck fifty-two prospective jurors for cause and three others for reasons not disclosed in the record, leaving thirty-six white persons and five African-Americans in the venire.

¶8. The attorneys were allowed to exercise strikes only on the twelve lowest-numbered members of the venire. Each time a strike was exercised, the next lowest-numbered juror joined the twelve potential jurors subject to peremptory strikes. The State exercised seven peremptory strikes, and Pitchford exercised twelve. The persons who replaced the nineteen strikes, plus the original twelve, resulted in thirty-one potential jurors subject to peremptory strikes by the attorneys.

¶9. Of the thirty-one potential jurors subject to peremptory strikes, Pitchford struck twelve whites and no African-Americans. Thus, there were nineteen potential jurors – fourteen of

3

whom were whites and five of whom were African-Americans – subject to the State's peremptory strikes. Although the State was allowed twelve peremptory strikes, it exercised only seven – three whites and four African-Americans.

¶10. Following jury selection, the case proceeded to trial, and on February 8, 2006, the jury found Pitchford guilty of capital murder. On February 9, the case proceeded to the penalty phase, at which the jury imposed a sentence of death by lethal injection. Pitchford filed a motion for a new trial on February 17, 2006, which was denied. He timely filed his notice of appeal.

## STANDARD OF REVIEW

¶11. We review death-penalty appeals under a heightened standard of review. As we have previously stated,

> [t]he standard for this Court's review of an appeal from a capital murder conviction and death sentence is abundantly clear. On appeal to this Court, convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny."[1]

Additionally, we have stated that "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death."[2] Bearing in mind our standard of review, we shall now proceed to analyze Pitchford's assignments of error in the order in which he presented them.

**I. WHETHER THE JURY SELECTION PROCESS WAS CONSTITUTIONALLY INFIRM AND REQUIRES REVERSAL OF PITCHFORD'S CONVICTION AND SENTENCE OF DEATH.**

---

[1]***Loden v. State***, 971 So. 2d 548, 562 (Miss. 2007) (quoting ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992)).

[2]***Id***. (quoting ***Irving v. State***, 361 So. 2d 1360, 1363 (Miss. 1978)).

4

¶12. In his first assignment of error, Pitchford makes three arguments, which we shall address in turn.

      A.    Whether The State Discriminated On The Basis Of Race In Its Peremptory Strikes In Violation of **Batson v. Kentucky**.

¶13. Citing **Batson v. Kentucky,**[3] Pitchford asserts the State exercised its peremptory strikes in a racially discriminatory manner.[4] In **Batson**, the United States Supreme Court held that the State of Kentucky was prohibited from racially discriminating through its exercise of peremptory strikes.[5] Building on **Batson**, the Supreme Court later stated that the Constitution forbids striking even a single juror for a discriminatory purpose.[6] For purposes of analyzing a claim of discrimination in jury selection, **Batson** and its progeny have established a three-step inquiry for courts to follow.

¶14. First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has

---

[3]476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[4]The record of the racial make-up of the venire is not well-preserved. Much of the information upon which we must rely comes from handwritten notations on jury lists which are included in the record. Some of the notations are illegible and, although substantially similar, the information on the jury lists does not match the information recited in Pitchford's brief.

[5]**Id**. at 82-84.

[6]**Snyder v. Louisiana**, 552 U.S. 472, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008) (internal citations omitted).

been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.[7]

*Prima facie showing*

¶15.    As stated, a trial court faced with a ***Batson*** challenge must determine whether the defense[8] has made a prima facie showing that race was the criterion for the prosecution's strike.   This Court has held that the required prima facie showing can be made by demonstrating that the percentage of the State's peremptory strikes exercised on members of the protected class was significantly higher than the percentage of members of the protected class in the venire.[9]

¶16.    Pitchford points out in his brief that the State used only seven of its peremptory strikes, four of which removed African-Americans from the venire.  As a result, only one African-American remained on the jury of fourteen (twelve jurors and two alternates).  This, Pitchford argues, is incompatible with the fact that, in 2006, African-Americans made up approximately forty percent of Grenada County's population.  In that regard, the following exchange occurred at trial:

MS. STEINER:    Allow us to state into the record there is one of 12 – of fourteen jurors, are non-white, whereas this county is approximately, what, 40 percent?

---

[7]***Flowers v. State***, 947 So. 2d 910, 917 (Miss. 2007) (citations omitted).

[8]Although we use the defense as an example, a ***Batson*** challenge may be brought by the prosecution if it suspects that the defense has exercised a peremptory strike based on the race (or other protected classification) of the prospective juror.

[9] ***Strickland v. State***, 980 So. 2d 908, 916 n.1 (Miss. 2008) citing ***Flowers***, 947 So. 2d at 935.

6

MR. BAUM:          The county is 40 percent black.

THE COURT:          I don't know about the racial makeup, but I will note for
                    the record there is one regular member of the panel that
                    is black, African American race.

In his motion for a new trial, Pitchford stated the following:

> The state was allowed to use all of its peremptory challenges to remove all but
> one African-American from the jury resulting in a jury composed of less than
> 10% African-American citizens selected from a county with nearly a 45%
> African-American population.

Although Pitchford's counsel made these assertions, he presented the trial judge no evidence of the racial makeup of Grenada County. And regardless of the racial makeup of Grenada County, we are persuaded that the record supports the trial court's finding of a prima facie showing of discrimination.

¶17.   The racial makeup of the venire subject to the State's peremptory strikes[10] was fourteen whites (seventy-four percent), and five blacks (twenty-six percent). Thus, statistically speaking,[11] if all other factors were equal, the State's peremptory strikes should approximate these percentages, resulting in the state striking either one or two African-

---

[10]We do not refer to the entire venire responding to their jury summonses, but rather to the members of the venire who were actually subject to the State's decision to keep or strike, that is, the first twelve presented to the State, plus the seven who replaced the State's seven strikes. Those nineteen veniremen were the only members of the entire venire against whom the State could possibly have discriminated. The racial makeup of the members of the venire who were never considered for peremptory strikes is not relevant to the inquiry.

[11]For purposes of analyzing the prima facie showing, we recognize that a cold statistical analysis will determine only whether the percentage of the State's peremptory strikes of African-Americans was significantly higher than the racial makeup of the venire. However, we fully recognize that, in the real world, there may be many legitimate reasons for the percentage imbalance. Indeed, once a statistical imbalance is established, the State is allowed to explain its reasons for each strike.

7

Americans.[12]  However, the State used fifty-seven percent of its peremptory strikes on African-Americans.  Stated another way, the State used fifty-seven percent of its peremptory strikes (four out of seven) to remove African-Americans from a venire comprised of twenty-six percent African American and seventy-four percent white.  While the difference in these percentages is not so great as to constitute, as a matter of law, a prima facie finding of discrimination, it is sufficient for a trial judge – who was "on the ground" and able to observe the voir dire process, and in the exercise of sound discretion – to so find.

¶18.    We cannot say the trial court abused its discretion in finding that  Pitchford made a prima facie case of discrimination.  A prima facie case, however, is nothing more than a level of suspicion the trial judge finds significant enough to merit further inquiry.

*Race-neutral reasons – pretext*

¶19.    Because the trial judge was persuaded that  Pitchford had demonstrated a prima facie case of discrimination, he then required the State to provide its race-neutral reason for each peremptory strike exercised on an African-American.  The four black jurors struck by the State were:  Carlos Fitzgerald Ward, Linda Ruth Lee, Christopher Lamont Tillmon, and Patricia Ann Tidwell.  On appellate review,

> we give great deference to the trial court's findings of whether or not a peremptory challenge was race-neutral . . . . Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal . . . . Indeed, we will not overrule a trial court on a ***Batson*** ruling unless the

---

[12]26% x 7 = 1.8.

record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence.[13]

*Carlos Ward*

¶20.    As to its race-neutral reasons for striking Ward, the prosecutor stated:

We have several reasons. One, he had no opinion on the death penalty. He has a two-year-old child. He has never been married. He has numerous speeding violations that we are aware of. The reason that I do not want him as a juror is he is too closely related to the defendant. He is approximately the same age as the defendant. They both have never been married. In my opinion he will not be able to not be thinking about these issues, especially on the second phase. And I don't think he would be a good juror because of that.

¶21.    In ***Lockett v. State***,[14] this Court included an appendix of "illustrative examples" of race-neutral reasons upheld by other courts which includes age and marital status. The trial judge found the State's proffered race-neutral reason acceptable. We cannot say the trial judge abused his discretion.

*Linda Ruth Lee*

¶22.    In stating its race-neutral reason for striking prospective juror Lee, the prosecutor stated:

S-2 is black female, juror number 30. She is the one that was 15 minutes late. She also, according to police officer, police captain, Carver Conley, has mental problems. They have had numerous calls to her house and said she obviously has mental problems. . . .

---

[13]***Lynch v. State***, 877 So. 2d 1254, 1270 (Miss. 2004) (quoting ***Walker v. State***, 815 So. 2d 1209, 1214 (Miss. 2002)).

[14]517 So. 2d 1346, 1356-57 (Miss. 1987).

9

¶23. That a juror "obviously has mental problems" was clearly a race neutral reason. The trial judge found the State's proffered race-neutral reason acceptable. We cannot say the trial judge abused his discretion.

*Christopher Lamont Tillmon*

¶24. The State proffered the following reason for exercising a peremptory strike against Tillmon:

> S-3 is a black male, number 31. Christopher Lamont Tillmon. He has a brother who has been convicted of manslaughter. And considering that this is a murder case, I don't want anyone on the jury that has relatives convicted of similar offenses.

¶25. This Court has recognized a juror's (or family member's) criminal history to be a race-neutral reason for exercising a peremptory challenge.[15] The trial judge found the State's proffered race-neutral reason acceptable. We cannot say the trial judge abused his discretion.

*Patricia Anne Tidwell*

¶26. The State proffered the following reason for striking Tidwell:

> S-4 is juror number 43, a black female, Patricia Anne Tidwell. Her brother, David Tidwell, was convicted in this court of sexual battery. And her brother is now charged in a shooting case that is a pending case here in Grenada. And also, according to police officers, she is a known drug user.

¶27. The trial judge found the State's proffered race-neutral reason acceptable. We cannot say the trial judge abused his discretion.

*Pretext*

¶28. Pitchford argues on appeal that the State's proffered race-neutral reasons were a pretext for discrimination. Pitchford points out that some of the reasons the State proffered

---

[15]***Lynch v. State***, 877 So. 2d 1254, 1271-72 (Miss. 2004).

10

for its strikes of blacks were also true of whites the State did not strike. Although Pitchford devoted a considerable portion of his brief and oral argument before this Court to his pretext argument, he did not present these arguments to the trial court during the voir dire process or during post-trial motions.

¶29. This Court has held that, "[i]f the defendant fails to rebut, the trial judge must base his [or her] decision on the reasons given by the State."[16]

¶30. As stated, Pitchford provided the trial court no rebuttal to the State's race-neutral reasons. We will not now fault the trial judge with failing to discern whether the State's race-neutral reasons were overcome by rebuttal evidence and argument never presented.

¶31. Pitchford also argues that the totality of the circumstances shows that the State's peremptory challenges were exercised in a discriminatory manner. Pitchford points out the fact that the State used only seven of its twelve peremptory challenges, striking four of five blacks on the panel, but only three of thirty-five whites. Pitchford points out that, even though the State had five available peremptory strikes, it failed to strike whites who shared similar characteristics to some of the blacks who were struck for cause.

¶32. We find this to be Pitchford's attempt to present his pretext argument in another package. As already stated with respect to each of the four African-Americans struck by the

---

[16]***Berry v. State***, 802 So. 2d 1033, 1037(Miss 2001); ***Manning v. State***, 735 So. 2d 323, 339 (Miss. 1999) ("It is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver."); ***Woodward v. State***, 726 So. 2d 524, 533 (Miss. 1997) ("In the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point").

State, Pitchford failed to provide any argument concerning pretext during the **Batson** hearing.[17]  We will not entertain those arguments now.

> B.   Whether The Trial Court Otherwise Deprived Defendant Of A Jury Comprised As Required By The Sixth And Fourteenth Amendments.

¶33.   As to this assignment of error, Pitchford makes two arguments: first, that the death qualification process, itself, so disproportionately impacts black jurors that it amounts to a violation of the Equal Protection Clause; and second, that the trial judge improperly removed for cause jurors who were properly qualified.

¶34.   The State asserts that this entire line of argument is procedurally barred because Pitchford failed to raise a contemporaneous objection when the jurors were excused. Pitchford contends, however, that he preserved the issue by objecting prior to the court's releasing any of the individuals identified as **Witherspoon**-ineligible.[18]  We find that Pitchford is correct, and that this issue was properly preserved for appeal.

*Racial Discrimination as a result of death-qualification process.*

¶35.   At the conclusion of voir dire, the trial court excluded thirty of the thirty-five prospective black jurors for cause.  The record reveals that most (and Pitchford alleges in his brief that all) were excluded because they were philosophically unable to consider imposing a sentence of death.  Pitchford argues that the disproportionate exclusion of blacks for cause

---

[17]We agree with Presiding Justice Graves's argument that – in adjudicating the pretext issue – the trial judge must look at the totality of the circumstances and all of the facts.  However those circumstances and facts do not include arguments not made by Pitchford's counsel.

[18]*See* **Witherspoon v. Illinois**, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) (State may not exclude jurors for cause because of general objections to the death penalty or expressed conscientious or religious scruples against its infliction).

"creates a prima facie case that the Equal Protection Clause has been violated." In other words, Pitchford argues that, in general, the percentage of African-Americans who oppose the death penalty is higher than the percentage of whites.

¶36. This Court, addressing a similar argument, has held that "a defendant has no right to a petit jury composed in whole or in part of persons of his own race."[19] The gist of the holdings in these cases is that – in the context of the right to a trial by a jury of one's peers – one's peers are not determined by one's race, so this argument has no merit.

¶37. Pitchford also argues that the trial judge's questioning and exclusion of four panel members was error. Pitchford argues that *Witherspoon* does not require exclusion of prospective jurors who cannot impose the death penalty.

¶38. Although *Witherspoon* does not address the issue, the following clear language from a subsequent case does:

> *Witt* held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " 469 U.S. at 424, 105 S. Ct. at 852 (quoting *Adams v. Texas*, supra, 448 U.S. at 45, 100 S. Ct. at 2526). Under this standard, it is clear from *Witt* and *Adams*, the progeny of *Witherspoon*[,] that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause.[20]

---

[19]*Underwood v. State*, 708 So. 2d 18, 28-29 (Miss. 1998) (quoting *Pinkney v. State*, 538 So. 2d 329, 346-47 (Miss. 1988), *vacated on other grounds* by *Pinkney v. Mississippi*, 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990).

[20]*Morgan v. Illinois*, 504 U.S. 719, 728-29, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). *See also Grayson v. State*, 806 So. 2d 241, 254 (Miss. 2001) (strike for cause proper where potential juror's viewpoint on the death penalty "[w]ould prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath") quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)).

¶39. Although the four jurors in question indicated on their questionnaires that they could not impose the death penalty under any circumstances, Pitchford points out that, during voir dire, defense counsel asked these prospective jurors some variation of "could you consider both, not could you vote for one. Could you consider, think about both and make a decision as to which one you wanted to vote for," to which they answered in the affirmative. However, the trial judge later undertook voir dire of those four panel members and asked them "Can you consider the death penalty or would you not be able to consider it," to which each of the four replied that they could not consider it.

¶40. We find ***Morgan*** to be directly on point. The trial judge did not commit error by striking for cause the jurors who indicated they could not impose the death penalty.

      C.      Whether the Trial Court Erred in Precluding the Defense From Questioning Prospective Jurors Concerning Their Ability to Consider Mitigating Evidence.

¶41. Pitchford next argues that the trial court improperly prevented him from asking potential jurors whether they would consider specific mitigating factors. During voir dire, the following exchange occurred:

> DEFENSE: . . . Mr. Pitchford is 19, just turned 19, I think, or maybe 20. I'm getting old. Does anybody here who thinks what happened to you, if anything, or during your lifetime before you got charged with a crime should not count in deciding whether you receive life or death?

> STATE: Your Honor, I object again because we are getting into the jury deciding on mitigators and aggravators at this point. And this is definitely not proper.

¶42. The trial judge informed Pitchford's counsel that, while he would be allowed to ask questions as to whether the jurors would be able to consider the mitigating factors presented

by the court, he would not be allowed to get into specifics. Pitchford's counsel responded, "I certainly don't intend to do that," and continued his voir dire of the jury.

¶43. Voir dire of a jury "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion."[21] Pitchford now argues that it was error for the trial court to preclude his questions concerning the kinds of mitigation evidence he planned to introduce.

¶44. Pitchford cites no authority directly supporting this proposition. He cites ***Abdul-Kabir v. Quarterman***,[22] ***Penry v. Johnson***,[23] ***Tennard v. Drake***,[24] and ***Smith v. Texas***,[25] each of which is inapposite. Although these cases discuss the type of mitigation evidence that may be presented to a jury and how it should be instructed for sentencing, they say nothing of the defendant's right to conduct voir dire.

¶45. In ***Trevino v. Johnson***,[26] the United States Court of Appeals for the Fifth Circuit addressed an argument almost identical to the one presented by Pitchford. The Court stated:

> Trevino . . . argues that the trial court erred in refusing to allow him to inquire during voir dire whether three prospective jurors were able to consider youth as a potentially mitigating factor. Trevino contends that youth is a "relevant mitigating factor of great weight," ***Eddings v. Oklahoma***, 455 U.S. 104, 116, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), and that under ***Morgan v. Illinois***, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), the trial court's refusal

---

[21]***Foster v. State***, 639 So. 2d 1263, 1274 (Miss. 1994) (quoting ***Morgan***, 504 U.S. at 729).

[22]550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007).

[23]532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001).

[24]542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004).

[25]550 U.S. 297, 127 S. Ct. 1686, 167 L .Ed. 2d 632 (2007).

[26]168 F. 3d 173, 182-83 (5th Cir. 1999).

15

to allow him to question the jurors regarding youth violated his due process rights.

. . .

This circuit has previously stated that **Morgan** **only** "involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant." *United States v. Greer*, 968 F. 2d 433, 437 n.7 (5th Cir.1992) (internal quotation marks omitted); see also *United States v. McVeigh*, 153 F.3d 1166, 1208 (10th Cir.1998) ("[W]e have held that **Morgan** does not require a court to allow questions regarding how a juror would vote during the penalty phase if presented with specific mitigating factors. Other courts have issued similar rulings, holding that **Morgan** does not require questioning about specific mitigating or aggravating factors.") (citation omitted); *United States v. McCullah*, 76 F.3d 1087, 1113 (10th Cir.1996) (finding that **Morgan** only requires questioning during voir dire regarding whether jurors would automatically impose the death penalty, and it does not require specific questioning regarding mitigating factors), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997); *United States v. Tipton*, 90 F.3d 861, 879 (4th Cir. 1996) (finding it was not an abuse of the trial court's discretion to refuse to allow detailed questioning during voir dire concerning specific mitigating factors), cert. denied, 520 U.S. 1253, 117 S. Ct. 2414, 138 L. Ed. 2d 179 (1997), and cert. denied, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997), and cert. denied, 520 U.S. 1253, 117 S. Ct. 2414, 138 L. Ed. 2d 179 (1997). After applying the AEDPA-mandated standard of review to these state-court findings and conclusions, we cannot say that Trevino has made a substantial showing of the denial of a constitutional right on this issue. We therefore decline to issue Trevino a [certificate of appealability] on this issue.[27]

¶46. We agree with this interpretation of **Morgan**, that is, a trial court is not required to allow questions regarding how a juror would vote during the penalty phase, if presented with specific mitigating factors. Thus, we find no merit in this assignment of error.

II. **WHETHER THE TRIAL COURT DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO PRESENT A FULL, COMPLETE AND ADEQUATELY DEVELOPED DEFENSE AND/OR TO HAVE HIS COUNSEL RENDER CONSTITUTIONALLY EFFECTIVE ASSISTANCE IN DOING SO**

---

[27]*Id*.

¶47. Under this assignment of error, Pitchford argues he should have been granted continuances, and that the trial court erred in refusing to delay the sentencing proceedings so that a necessary mitigation witness could be present to testify.

A.   Continuances

¶48. We use an abuse-of-discretion standard in reviewing a trial court's decision to grant, or refuse to grant, a continuance.[28]  We will reverse a trial court's decision only where manifest injustice would result.[29]

*January 19, 2006,* [30] *request for continuance – ineffective assistance of counsel*

¶49. In March, 2004, the trial court appointed Ray Baum to represent Pitchford. Ray Carter joined the defense team in June 2005. The trial, which originally was set for July 13, 2005, was rescheduled to begin on January 9, 2006, and then continued again to begin on February 6, 2006.

¶50. Pitchford filed a motion for yet another continuance, alleging *inter alia* that his attorneys needed still more time to interview members of his family who lived in California as possible mitigation witnesses. Pitchford's counsel argued they needed more time to analyze his psychiatric evaluation, which had been performed at the Mississippi State Hospital in Whitfield. On January 19, 2006, the trial court denied the motion.

¶51. Pitchford now argues that his failure to obtain the continuance caused his counsel to render ineffective assistance of counsel throughout the trial. He argues that "the result of the

---

[28]***Stack v. State***, 860 So. 2d 687, 691-92 (Miss. 2003).

[29]***Simmons v. State***, 805 So. 2d 452, 484 (Miss. 2002).

[30]The transcript erroneously labels this hearing as having occurred on January 9, 2006.

17

denial of the continuance comes in the cumulative effect of numerous lesser weaknesses that an attorney would have if he had not been required by erroneous trial court rulings to make Hobson's choices about how to allocate his preparation." Specifically, he claims his failure to obtain a continuance resulted in the following instances of ineffective trial counsel: (1) his counsel was unprepared to begin his opening statement; (2) his counsel was disorganized at the guilt-phase jury-instruction conference; (3) his counsel failed to object to leading questions by the State. Pitchford also argues that, as a result of the lack of the continuance, he was unable to have his own expert analyze a court-ordered psychiatric evaluation from the Mississippi State Hospital at Whitfield, and his counsel was unable to interview witnesses from his paternal family in California. He claims these family members might have been able to contribute to his mitigation defense.

¶52.    Pitchford was represented at trial by three attorneys: Ray Baum, Ray Charles Carter, and Alison Steiner. Carter and Steiner continue to represent Pitchford on this direct appeal. This Court has stated that "it is absurd to fantasize that [a] lawyer might effectively or ethically litigate the issue of his own ineffectiveness."[31] Also, because most of these claims of ineffective assistance of counsel necessarily will involve evidence outside the record, they are more appropriately presented in a petition for post-conviction relief.

¶53.    So for these reasons, we decline to address Pitchford's issues involving ineffective assistance of counsel, but hold that he may bring them in a properly-filed petition for post-conviction relief. However, without foreclosing Pitchford's right to raise the issue of

---

[31]*Lynch v. State*, 951 So. 2d 549, 551-52 (Miss. 2007) (quoting **Read v. State,** 430 So. 2d 832, 838 (Miss. 1982).

18

ineffective assistance of counsel in a subsequent post-conviction-relief proceeding, we shall address Pitchford's claim that the trial judge abused his discretion by denying the January 19 motion for a continuance.

¶54. As of the trial date, Ray Baum had served as Pitchford's counsel for more than a year, and Ray Carter had been working on the case for more than eight months. In cases where counsel had even less time to prepare, we found no error on similar claims.[32] So we hold today that the trial judge did not abuse his discretion by denying Pitchford's motion for continuance.

*Unavailable mitigation expert*

¶55. Pitchford's second argument is that, even though no continuance was requested, the trial court committed plain error by failing to continue the beginning of the penalty phase. Prior to the start of the penalty phase of the trial, Pitchford retained the services of a mental-health expert, Dr. Rahn Bailey. However, Dr. Bailey, who was under subpoena for a trial in Texas, was not available to testify at the start of the penalty phase on February 8, 2006. Counsel for Pitchford contacted the trial judge and advised him of the scheduling conflict. The trial judge called the court in Texas and confirmed that Dr. Bailey was under subpoena there. The following morning, Pitchford's counsel advised the court that Dr. Bailey was available but that he would not be called to testify.

¶56. Pitchford now argues that "although there was no express request for a continuance made . . . the trial court was made fully aware that the Defendant desired to present the testimony of Dr. Rahn Bailey," and the failure of the trial court to continue the trial amounted

---

[32]*See e.g.* ***Ruffin v. State***, 992 So. 2d 1165, 1175 (Miss. 2008).

19

to plain error because of the prejudice that Pitchford's defense suffered from the lack Dr. Bailey's testimony.

¶57.     This argument is frivolous and without merit.  The trial court cannot be held to err on an issue not presented to it for decision.[33]  Counsel not only failed to ask for a continuance, he advised the trial court that the witness was available, but would not be called to testify. A trial court has no duty to *sua sponte* second-guess decisions by defense counsel.  This issue has no merit.

### III.     PROSECUTORIAL MISCONDUCT

¶58.     Pitchford next claims the prosecutor engaged in misconduct that deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 3, Sections 14, 26, and 28 of the Mississippi Constitution.  This Court has stated that, "Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow."[34]

¶59.     Pitchford argues the prosecutor intentionally violated the Rules of Evidence in order to present misleading or inflammatory evidence to the jury, and made improper appeals to the jury at both the guilt and sentencing phases of the trial.  Pitchford also claims the prosecutor used near-leading or misleading questions on its own witnesses, coached witnesses, interjected information into the responses from witnesses, and   rested its

---

[33]*McCurdy v. State*, 511 So. 2d 148, 150 (Miss. 1987).

[34]*Goodin v. State*, 787 So. 2d 639, 645 (Miss. 2001) (citing *Acevedo v. State*, 467 So. 2d 220, 226 (Miss. 1985)).

arguments on facts not in evidence or inferences too attenuated from the facts which were in evidence.

¶60. The State argues that Pitchford did not object to these alleged improprieties at trial or in his motion for a new trial. Thus, the State argues, the claims are procedurally barred on direct appeal. While Pitchford admits no contemporaneous objections were made, he points out that his motion for a new trial included the following assignment of error:

> The Court allowed the district attorney to improperly argue during the penalty phase closing that their job was to go back there and vote for the death over defendant's objection.

¶61. Even had he not included this item in his motion for a new trial, Pitchford clearly objected to the prosecutor's "in the box" comments at trial. Pitchford also objected at trial to the prosecutor's comments that Walter Davis and his son may have been killed if they had arrived at the store any earlier; the prosecutor's questioning of Dominique Hogan as to the nature of her relationship with Pitchford; and the prosecutor's questioning of Pitchford's sister about the "problems he got in at school" and the time frame of his father's illness. So Pitchford properly preserved these allegations of misconduct for appeal.

¶62. Pitchford argues the prosecutor misrepresented the facts in closing argument by suggesting that Bullins voluntarily turned himself in and confessed, and that Pitchford was the man who fired the shots which killed the decedent. Specifically, the prosecutor stated to the jury: "[Bullins] went to the sheriff's department the same morning of the murder and he admitted it." According to the record, however, Investigator Conley testified only that he "talked to" Bullins. While arguably inconsistent with the facts, the prosecutor's statement did not rise to the level necessary to "[endanger] the fairness of [the] trial and the impartial

21

administration of justice," as required by *Goodin*.[35] Thus, this assignment of error has no merit.

¶63. Pitchford also complains that the prosecutor improperly stated during closing arguments that

> [Pitchford and Bullins] both shot [Britt]. It doesn't matter which one shot with which gun. That hasn't got anything to do with this case. I think because it was his .22, he probably had it but that doesn't matter. All we have got to prove is that they went in that store together to rob it and they killed him.

¶64. Pitchford claims because the statement – he "probably" had the .22 – has no evidentiary basis in the record, this constitutes improper vouching for snitch witnesses. But the trial judge properly instructed the jury as to accomplice liability, and we find the prosecutor's statement was not outside his theory of accomplice liability. So this allegation of misconduct has no merit.

¶65. Pitchford next points out that the prosecutor stepped outside the bounds of evidence when he argued that the gun found in Pitchford's car was Britt's gun. But Marvin Fullwood testified that he had given Britt that exact gun approximately two years before the trial. Also, Investigator Conley testified that he had recovered the same gun from Pitchford's car, so the prosecutor's statement was not outside the bounds of evidence, and this allegation of misconduct has no merit.

¶66. Pitchford argues he is entitled to a reversal of his conviction because the prosecutor proclaimed to the jury during closing argument that Pitchford was a "habitual liar." Pitchford argues the statement impermissibly spoke to his general character and was an indirect

---

[35] 447 So. 2d at 645.

22

comment on his failure to testify, violating his Fifth-Amendment rights. In its brief, the State responds:

> During his closing argument, Pitchford . . . attacked the prosecution witnesses extensively as liars and [offered] testimony they could not be trusted or relied upon. The defense attack on the honesty of the prosecution witnesses invited the response tendered by the prosecution and was not error.

The State's "if Pitchford did it, we can do it" argument has no merit.

¶67. First, regardless of whether either party "opened the door," Pitchford's counsel had every right to attack and question the credibility of witnesses who had testified for the prosecution. Pitchford did not testify at trial, and had he not given statements to police on November 7 and 8, 2004, Pitchford's argument might indeed have merit. However, because his statements to police were before the jury, the prosecutor's attack on Pitchford's credibility was not inappropriate.

¶68. Pitchford argues the prosecutor should not have alluded to the possibility that Pitchford might have killed Walter Davis and his son, had they arrived on the scene right after the murder while Pitchford was still in the store. Pitchford characterizes this speculation as an attempt to incite prejudice and fear in the jury.

¶69. According to the record, the following exchange took place during closing argument:

Mr. Evans: The Davis's walked in there at 7:27. We would of had two more dead people –
Mr. Carter: Your Honor, I object to that.
Mr. Evans: – if he had walked in there earlier.
Mr. Carter: Your Honor, how can – he cannot say that.
Mr. Evans: Your Honor, that is something that the jury can clearly see from the facts.
The Court: He can make things that are reasonable inferences and has a right to comment on the evidence as he sees a reasonable

23

inference to be. And it's up to the jury to determine the facts. So I'll overrule the objection.

¶70. This Court has held that the closing arguments may include inferences drawn from the evidence presented.[36] However, the fact that a particular inference may be drawn from the evidence does not *per se* suggest that the inferences properly may be presented to the jury. ***Rubenstein*** does not stand for the proposition that a prosecutor may present inappropriate inferences, even those that fairly may be drawn from the evidence.

¶71. While one fairly might infer from the evidence in this case that – had they arrived earlier – Walter Davis and his son might have been killed, that inference certainly is not admissible in the prosecution of Pitchford for the murder of Reuben Britt. After-the-fact speculation as to whether Pitchford might or might not have committed additional murders is no evidence whatsoever in the prosecution of this case. The trial judge should have sustained the objection to the prosecutor's inappropriate statement. However, in the context of this case, with the overwhelming evidence of guilt presented to the jury, we find this inappropriate statement, and the trial judge's incorrect ruling, to be harmless error. This Court will deem harmless an error where "the same result would have been reached had [it] not existed."[37]

¶72. Pitchford complains that, during the penalty phase, the prosecutor asked Dominique Hogan, the mother of Pitchford's child: "Isn't it a fact that y'all were doing a lot of fighting?" Hogan answered in the negative. The prosecutor then asked, "Were y'all going with other

---

[36]***Rubenstein v. State***, 941 So. 2d 735, 779 (Miss. 2006).

[37]***Tate v. State***, 912 So. 2d 919, 926 (Miss. 2005) (quoting ***Burnside v. State***, 882 So. 2d 212, 216 (Miss. 2004)).

24

people at the time?" Again, Hogan answered in the negative. Pitchford's counsel objected, stating the prosecution had no basis for asking such questions. The trial judge required the prosecutor to demonstrate a good-faith basis for asking the questions. The prosecutor produced Pitchford's psychological evaluation, which provided the good-faith basis for the question. Because the prosecutor demonstrated a good-faith basis for the questions, and further, because Pitchford shows no endangerment of the trial's fairness as required by *Goodin*,[38] this allegation of misconduct has no merit.

¶73. The prosecutor cross-examined Pitchford's sister and mother about Pitchford's behavior as a child and youth. Pitchford complains that, during the cross-examination they testified to prior bad acts. However, his sister testified on direct that she would receive phone calls from teachers when he "got in trouble" at school. Furthermore, his mother testified that, after his father's death, Pitchford "started having problems at school." Both witnesses opened the door as to the nature of the problems Pitchford had at school, so this allegation of misconduct has no merit.

¶74. Pitchford claims that the prosecutor – when questioning his sister about their father's death – made inappropriate, inflammatory remarks, as follows:

> Q: Now, you said it was hard on him because his daddy only had about a month before he died.
> A: Yeah. Yes. Yes.
> Q: Okay. At least he did have a month, didn't he?
> A: Yes, he did.
> Q: That is better than somebody just being murdered and their family not –

---

[38] 787 So. 2d at 645.

25

Mr. Carter:     Your Honor, that is an absolutely improper question and he
                knows it.
The Court:      I'll overrule the objection. . . .

Q:      Him having about a month before his daddy died is a lot better than a
        family that doesn't have any time, that family member is just shot down
        and murdered, isn't it?
A:      I agree.

¶75.   Pitchford cites numerous cases in support of his argument that these statements had

an inflammatory effect.  The crux of their holdings can be summed up as follows:

> There can be no graver proceeding than when a human being is put on trial for
> his or her life. The right to a fair trial includes the right to a verdict based on
> the evidence and not extraneous prejudicial happenings in and around the
> courtroom.[39]

¶76.   The State responds to this issue minimally, arguing only that Pitchford's objection at

trial was too general.  We find the prosecutor's question was an improper attempt to incite

the jurors' emotions and anger.  It had no proper basis, and the objection to the question

should have been sustained.  However, we find the answer to the question was both obvious

and already known to the jurors.  Thus, we find the error was harmless.

¶77.   Pitchford next claims the prosecutor instructed the jury to consider the "heinous

atrocious, and cruel" aggravator during the sentencing phase without the proper limiting

instruction or evidentiary support.  Mississippi Code Section 99-19-101(5)(h) allows the

heinous, atrocious, or cruel nature of the crime to be considered as an aggravating

circumstance.[40]  The complained-of language during the prosecution's closing is as follows:

---

[39]*Fuselier v. State*, 468 So. 2d 45, 53 (Miss. 1985).

[40]Miss. Code Ann. § 99-19-105 (5)(h) (Rev. 2007).

26

> Y'all saw the autopsy photographs. There is not much of a place that you could touch on his body that didn't have some gunshot wound on it. Brutal. This is the ultimate crime. This is the type of crime that the death penalty is for. This is the type of person that the death penalty is for, somebody that could commit a crime like that.

The prosecutor made this statement in the course of describing the events surrounding the crime, as they happened. Immediately prior to these statements, the prosecutor described Pitchford's previously-thwarted attempt to rob the store, and immediately following these statements, he discussed testimony which had revealed that the decedent had pleaded for mercy before being killed. We find the prosecutor's statement was not a call for the jury to consider the heinous, atrocious, and cruel nature of the crime as an aggravating factor, but rather was part of the "story" of the crime as the State perceived it. So this allegation of misconduct has no merit.

¶78. Pitchford claims the prosecutor instructed the jury that they were "in the box" to give Pitchford the death penalty. Pitchford mischaracterizes the prosecutor's statements during closing argument. The complained-of exchange is as follows:

> I am not going to mince words with you up here. I am going to tell you just like I told you on voir dire. I am asking for the death penalty because the ultimate crime deserves the ultimate punishment. That is what we have got here.
>
> I am not going to sit up here and quote the Bible. . . . I think it is absurd to sit up here and try to confuse y'all with that. Y'all know what you are here for. The law is clear in this state. The death penalty is an appropriate punishment.
>
> If you'll remember, when y'all were sitting out here, I asked everybody in the panel –
>
> Mr. Carter:  Your Honor, I object. They are not here to give death. They are here to deliberate and go back there and make a decision on life without possibility of parole or death. They are not here for death. . . .To say that is improper.

27

The Court: Mr. Evans did not make that comment. So I'll allow him to proceed with his argument. Overrule the objection.

. . . .

As I told y'all when y'all were sitting out here, the important question that I asked y'all about that was this. And if any of y'all had answered this differently, you would not be here because this is a case where the death penalty is an appropriate punishment. If the law authorizes imposition of the death penalty and the facts justify it, could you give the death penalty? And the only ones that answered that they couldn't are gone. They are not here today. The law authorizes it because the judge has instructed you that the law authorizes it. The facts justify it because you have heard the facts. You have heard the testimony. You've seen the evidence. . . .The facts justify the death penalty in this case.

These closing remarks, read in context, clearly demonstrate that the prosecutor did not instruct the jury that they were there only to give the death penalty. Instead, he used his closing argument to persuade the jurors that -- from the prospective of the State --  the facts and the law together justified imposition of the death penalty, and each of the jurors had indicated that, in an appropriate case, they could impose the death penalty. So this allegation of prosecutorial misconduct has no merit.

¶79. Pitchford next claims the prosecutors "skirted their ethical obligations to see that the defendant [was] accorded procedural justice," and he claims such prosecutorial misconduct is incurably prejudicial and requires reversal of his sentence. However, as previously stated, given the overwhelming evidence of guilt, the statements we find inappropriate were harmless. Thus, this issue has no merit.

## IV. IMPROPER DISPLAYS OF EMOTION FROM NONTESTIFYING AUDIENCE MEMBERS

28

¶80. Pitchford's next assignment of error is that the jury was improperly influenced by displays of emotion from the victim's family. He claims two incidents served to prejudice his defense.

¶81. The first incident occurred following the State's direct examination of James Hathcock. Pitchford's counsel approached the bench and objected, claiming "family members are in the back of the courtroom crying out loud, loud enough for everybody in the courtroom to hear." The trial judge stated, "There have been no outbursts of any kind . . . . I have heard some sniffling going on . . . ," which he compared to sniffling as if one had a cold. Pitchford's counsel concluded the discussion with: "Well, Your Honor, we would just ask if it becomes any worse than it is that the Court excuse the jury temporarily and just tell the family that they should control it to the extent they can."

¶82. The second incident occurred during the penalty phase of the trial. Defense counsel approached the bench and informed the trial judge that some members of the audience were talking during questioning. Specifically, defense counsel claimed that – after he objected to a question as improper – someone in the audience said "no, it is not." The trial judge said he did not hear anything but nevertheless admonished members of the audience to refrain from commenting or making any noise.

¶83. Pitchford also makes a vague argument, citing no specifics, that the State made inflammatory appeals to the passion of the jury. We find the incidents – to the extent they

29

are documented in the record – were minor. Furthermore, Pitchford failed to request a curative instruction to the jury.[41] Accordingly, we find no error with this issue.

## V.    PERMITTING THE JURY TO HEAR INFORMANT TESTIMONY

¶84.    Pitchford's next argues the trial court improperly allowed the testimony of James Hathcock and Dantron Mitchell, both of whom had been incarcerated with Pitchford. Alternatively, he argues that the trial court erred by failing to give a requested cautionary instruction concerning informant testimony.

¶85.    Hathcock and Mitchell both testified that Pitchford had confessed his role in the murder. They also denied receiving any promises or hope of reward in exchange for their testimony, although charges against Hathcock eventually were dropped.[42]

*Testimony*

¶86.    Pitchford argues the testimony of the jailhouse "snitches" should have been excluded because "evidence from these witnesses was so unprobative and so prejudicial that Miss. R. Evid. 403[43] require[d] its exclusion." The State responds that Pitchford waived this issue

---

[41]*See e.g., **Bell v. State**,* 631 So. 2d 817 (Miss. 1994) (no prejudice after mother of victim shouted "He cold blooded killed my child" and judge gave curative instruction).

[42]Q:    Do you know what happened to those charges or that case?  You got any
          idea what happened on that?
    A:    I was told it was dropped.
    Q:    Okay.  Who told you that?
    A:    Justin.  The guy.  It was him I was with.  He stole $3,000 from his daddy.
          He gave me 500 of it to shut my mouth and like an idiot, I took.
    Q:    That was dropped you said.
    A:    Yes, sir.

[43]"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid.  403.

because he failed to raise it in the trial court. Pitchford responds that he did raise the issue in the trial court by way of his pretrial motion to exclude the testimony as unreliable under this Court's holdings in *McNeal v. State*,[44] and *Dedeaux v. State*.[45] Pitchford states "the weighing process required by Rule 403 is no different from that required under *McNeal/Dedeaux*."[46] We disagree.

¶87. The "reliability of testimony" is unrelated to Rule 403's balancing test. A completely true statement may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice." Although Pitchford did raise in the trial court the issue of reliability, he did not raise a Rule 403 objection. Thus, the issue is procedurally barred.[47]

*Cautionary instruction*

¶88. Pitchford next argues that the trial court erred by refusing to issue a cautionary instruction. He requested the following instruction:

> I instruct you that the law looks with suspicion and distrust on the testimony of a witness who has acted as an informant for the government. The law requires the jury to weigh testimony of an informant with great care and with caution and with suspicion.

---

[44] 551 So. 2d 151 (Miss. 1989).

[45] 87 So. 664 (Miss. 1921).

[46] *McNeal* and *Dedeaux*, while commenting on the unreliable nature of informant testimony, particularly testimony given in exchange for a reduced sentence, do not provide for a weighing process.

[47] *Walker v. State*, 913 So. 2d 198, 227 (Miss. 2005) (a trial court will not be held in error on a matter not presented to it for decision).

31

Although the trial court did not give the instruction requested by Pitchford, it did give the following instruction:

> The Court instructs the jury that the law looks with great suspicion and distrust on the testimony of an alleged accomplice or informant. The law requires the jury weigh the testimony of an alleged accomplice or informant with great care, caution and suspicion.

Pitchford also requested, but was denied, the following instruction:

> The Court instructs the jury that the testimony of an informant who provides evidence against a defendant for pay (or other benefit), must be examined and weighed by the jury with greater care than an ordinary witness. You the jury must determine whether the informant's testimony has been affected by interest or prejudice against the defendant.

¶89. Pitchford argues the instruction given was deficient because it lumped accomplice and informant testimony together and "ignored evidence before it that at least one informant had received a benefit." Indeed, this Court has not viewed informant testimony favorably.[48] However, this Court has upheld the denial of a cautionary instruction based partly on the fact that an informant did not receive any preferential treatment for his testimony.[49] Still, where the informant did receive a benefit, the jury should be instructed to regard such testimony with "caution and suspicion."[50]

---

[48]*Gray v. State*, 728 So. 2d 36, 72 (Miss. 1998).

[49]*Rubenstein v. State*, 941 So. 2d 735, 767 (Miss. 2006); *Manning v. State*, 735 So. 2d 323, 335 (Miss. 1999).

[50]*Moore v. State*, 787 So. 2d 1282, 1287-88 (Miss. 2001).

32

¶90.   This Court has stated, "jury instructions are within the sound discretion of the trial court."[51]   A court may refuse an instruction if it "is covered fairly elsewhere in the instructions."[52]

¶91.   We find ***Moore*** inapplicable to the facts of this case and, thus, no cautionary instruction was necessary.  Mitchell and Hathcock both testified that they were not promised, and did not receive, any favorable treatment in exchange for their testimony.[53]   Pitchford argues that Hathcock did receive a benefit, because his charges were dropped at a later date, although there was no evidence that this was because of his testimony.

¶92.   In any case, as required by ***Moore***,[54] the trial court granted a cautionary instruction that advised the jury to view informant testimony with caution and suspicion.  Thus, we find no error.

## VI.   FAILURE TO GRANT A MISTRIAL AFTER WITNESS TESTIFIED TO INADMISSABLE AND PREJUDICIAL MATTERS

¶93.   Pitchford's next assignment of error is that the trial court should have declared a mistrial after a State witness improperly testified to prejudicial and improper matters during cross-examination.  As Pitchford's counsel was cross-examining James Hathcock, who had testified that Pitchford had confessed the crime to him in jail, the following occurred:

> Q:   Are you and Pitchford good friends?  Were y'all good friends?

---

[51] ***Rubenstein v. State,*** 941 So. 2d 735, 787 (Miss. 2006) (citing ***Goodin v. State***, 787 So. 2d 639, 657 (Miss. 2001)).

[52] ***Thorson v. State***, 895 So. 2d 85 (Miss. 2004) (citing ***Heidel v. State***, 587 So. 2d 835, 842 (Miss. 1991)).

[53] ***Rubenstein***, 941 So. 2d at 767.

[54] 787 So. 2d at 1286-288.

A:     We lived close to each other for a little while.

Q:     Did y'all become real good friends where you would tell him your secrets?

A:     Not really.

Q:     Okay. And yet you want us to believe that he felt comfortable enough with you to tell you that he killed somebody.

A:     Well, he was selling me dope.

¶94. After this exchange, the jury was excused and Pitchford immediately moved for a mistrial, which the trial court refused to grant. The State previously had disclosed to the defense the fact that Pitchford had sold drugs to Hathcock. The trial judge instructed the jury to totally disregard the statement and made each juror affirm that he or she would disregard it.

¶95. A trial court "must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case."[55] This Court reviews a trial court's decision on a motion for a mistrial under an abuse-of-discretion standard. [56]

¶96. The witness's statement was clearly improper. However, the trial court took immediate and appropriate steps to cure any prejudicial effect. Furthermore, "it is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the

---

[55]*Parks v. State*, 930 So. 2d 383, 386 (Miss. 2006).

[56]*Id.*

34

jury system inoperable."[57]  Thus, we conclude that the trial court did not abuse its discretion by failing to grant a mistrial.[58]

## VII.  FAILURE TO SUPPRESS EVIDENCE OBTAINED THROUGH A WARRANTLESS SEARCH OF DEFENDANT'S AUTOMOBILE

¶97.  Pitchford argues the .38 caliber revolver used in the shooting and later discovered in his car should have been suppressed as the product of an illegal search.  After receiving information that Pitchford had been involved in a previous attempt to rob the store, Investigator Conley went to Pitchford's home, where, in the driveway, he spotted a vehicle matching the description of a vehicle seen by witnesses at the store prior to the robbery.  A tag search revealed that the car was titled to Pitchford and his mother, Shirley Jackson.

¶98.  Conley asked for permission to search the vehicle.  Pitchford consented orally, but refused to sign a consent form, while Jackson signed the consent form.  Conley (the only witness to testify at the suppression hearing) testified that, after Jackson had signed the consent form, Pitchford stated "momma, it's something in the car.  It's something in the car." Investigator Conley testified that Pitchford never withdrew his oral consent.

¶99.  Investigator Conley searched the vehicle and discovered the revolver.  Pitchford moved the trial court to suppress the evidence, claiming he did not consent, and that the search was illegal.  The trial court denied Pitchford's motion to suppress, finding that Conley had consent to search the vehicle and, alternatively, that Investigator Conley properly could have executed a warrantless search because of exigent circumstances.

---

[57]*Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994) (quoting *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

[58]*See*, *e.g.*, *Yarborough v. State*, 911 So. 2d 951, 956-58 (Miss. 2005).

¶100. Pitchford admits that he initially consented to the search. However, he claims he withdrew his consent. As evidence of the withdrawal, he points to the following trial testimony from Investigator Conley: "Pitchford was – when I went to search the car he started getting kind of angry, so I had him detained and moved to the side of the house." This testimony came during the trial, but was not provided during the suppression hearing. Also, Pitchford did not offer any proof concerning his demeanor during the search, as described by Investigator Conley, nor did he inform the trial judge that Investigator Conley had him detained and moved to the side of the house. We will not hold the trial judge in error for failure to suppress evidence based on testimony and evidence not given at the suppression hearing.

¶101. Both the United States and Mississippi Constitutions guarantee citizens the right to be secure in their persons, houses, and possessions against unreasonable and warrantless searches and seizures.[59] "While the warrant clauses of these provisions express the general rule that law enforcement must procure a warrant based on probable cause before engaging in a search, the rule has several exceptions. . . . Voluntary consent eliminates the warrant requirement."[60]

¶102. Pitchford argues that, because the search was conducted over his objection, the evidence should be suppressed. He cites ***Randolph v. Georgia***,[61] in which in the United

---

[59]U.S. Const. amend IV; Miss. Const. art. 3, § 23.

[60]***Moore v. State***, 933 So. 2d 910 (Miss. 2006) (citing ***Morris v. State***, 777 So. 2d 16, 26 (Miss. 2000)).

[61]547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006).

States Supreme Court held that a warrantless search of a shared dwelling, over the express refusal of consent by a physically present resident, cannot be justified as reasonable as to him, based on consent given to police by another resident. However, because we find Pitchford consented to the search and never withdrew his consent, we need not explore the issue addressed in *Randolph*.

¶103. We find this issue has no merit.

## VIII. FAILURE TO SUPPRESS STATEMENTS GIVEN TO LAW ENFORCEMENT AFTER DEFENDANT'S ARREST

¶104. In his eighth assignment of error, Pitchford asserts that the trial court should have suppressed five statements he made to police officers after his arrest because the statements were taken in violation of his Fifth, Sixth, and Fourteenth Amendment rights.

¶105. Following a pretrial hearing, the trial court denied Pitchford's motion to suppress the statements, stating: "The Court finds not only beyond a reasonable doubt but beyond any doubt whatsoever that these statements were freely and voluntarily given." Pitchford renewed his objection to the introduction of his statements during trial, and the trial court again overruled the objection.

¶106. A criminal "defendant may waive effectuation of [the right to remain silent and the right to the presence of an attorney], provided the waiver is made voluntarily, knowingly and intelligently."[62] A criminal defendant who challenges the voluntariness of the waiver has a

---

[62]***Miranda v. Arizona***, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

due process right to a reliable judicial review of whether the confession was, in fact, voluntarily given.[63]

¶107. The trial court's duty is quite clear on this issue. A trial judge must review the totality of the circumstances, and make a factual determination of whether the defendant intelligently, knowingly, and voluntary waived his or her rights.[64] Furthermore, the court must determine whether, under the totality of the circumstances, the accused was adequately warned.[65] The long-standing rule in this state is that the burden of proving the voluntariness of the confession is on the State.[66]

¶108. The officers who interrogated Pitchford testified he was offered no reward, and he was not threatened or coerced, and that his statement was voluntarily given. Such testimony creates a prima facie case of voluntariness.[67] However, when the defendant produces evidence that his waiver and confession were not voluntary, the State must produce evidence to directly rebut the defendant's claims.[68]

¶109. The standard of review for such a determination has been stated by this Court:

---

[63]*Powell v. State*, 540 So. 2d 13 (Miss. 1989) (citing *Jackson v. Denno*, 378 U.S. 368, 377, 84 S. Ct. 1774, 1781, 12 L. Ed. 2d 908, 915 (1964)).

[64]*McGowan v. State*, 706 So. 2d 231, 235 (Miss. 1997) (quoting *Neal v. State,* 451 So. 2d 743, 756 (Miss. 1984)).

[65]*Layne v. State*, 542 So. 2d 237, 239 (Miss. 1989) (citing *Jones v. State*, 461 So. 2d 686, 696-97 (Miss. 1984) and *Edwards v. Arizona*, 451 U.S. 477, 486, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 387 (1981)).

[66]*Lee v. State*, 236 Miss. 716, 112 So. 2d 254, 256 (1959).

[67]*Id.* at 255-256.

[68]*Id.* at 256.

Findings by a trial judge that a defendant confessed voluntarily, and that such confession is admissible are findings of fact. Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applies the correct legal standards, his [or her] decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence.[69]

¶110. Pitchford admits that the State obtained a written *Miranda* waiver prior to his first statement. However, he insists he gave no waiver prior to his next three statements. This Court has said:

Invocation of the right to counsel is a rigid, prophylactic rule which prohibits further questioning until an attorney is made available or the defendant knowingly and voluntarily waives his [or her] right. On the other hand, invocation of the right to silence concerns whether an officer scrupulously honors a defendant's right to cease questioning for a reasonable time, after which questioning may resume if the defendant knowingly and voluntarily waives this right.[70]

¶111. At the hearing on the motion to suppress, Investigator Conley provided the following testimony concerning the three statements he took from Pitchford on November 7, 2004:

Q:      I want to hand you back Exhibit 5 for identification and ask if you can tell the Court what this is.

A:      This is a *Miranda* Rights form.

Q:      Is that the same rights form that you used to advise this defendant, Terry Pitchford, of his rights?

A.      Yes, sir.

 . . .

---

[69]*Davis v. State*, 551 So. 2d 165, 169 (Miss. 1989) (citing *Frost v. State*, 483 So. 2d 1345, 1350 (Miss.1986)).

[70]*Chamberlin v. State*, 989 So. 2d 320, 334 (Miss. 2008) (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), and *Neal v. State*, 451 So. 2d 743, 755 (Miss. 1984)).

Q:   Did you advise him of all the rights on that form?

A:   Yes, sir.

Q:   Did it appear to you that he understood those rights?

A:   Yes, sir.

Q:   Why did it appear to you that he understood those rights?

A:   Because he told me he did.

Q:   And once you advised him of those rights, did he, in fact, sign that form and the waiver stating that he did not wish to have an attorney and he wanted to discuss the case with you?

A:   Yes, sir.

. . .

Q:   I believe he made three statements to you that day; is that correct?

A:   Yes, sir.

Q:   And on each of those taped statements before you started interviewing him did you go back into the fact of asking him if he understood the rights that you had previously advised him?

A:   Yes, sir.

Q:   And on each occasion did he tell you that he did?

A:   Yes, sir.

Q:   Did it appear to you that he did?

A:   Yes, sir.

Q:   On any of those statements did you use any pressure or coercion to get him to talk to you?

A:   No, sir.

Q:   Did you hold out any hope of reward or make him any promises?

A:   No, sir.

¶112. In light of Officer Conley's testimony, we cannot say the trial court's findings as to these statements were in error or contrary to the overwhelming weight of the evidence, as required by **Davis**.[71] Pitchford argues that, because the officers did not obtain a written waiver before Statements 2 and 3, there was no voluntary waiver. However, he cites no authority supporting this proposition. The record supports the trial court's findings that, under the totality of the circumstances, Pitchford voluntarily and intelligently waived his privilege against self-incrimination under **Layne**.[72]

¶113. Pitchford argues that, when he gave the first three statements on November 7, Investigator Conley made several false representations regarding the evidence against him. He admits that misrepresentations, in and of themselves, do not render his statements involuntary. However, he contends that such misrepresentations were components of improper psychological coercion leading up to the two statements he gave on November 8, 2004.

¶114. On November 8, Robert Jennings was scheduled to give Pitchford a polygraph exam. Jennings testified that, "after a short period of time, [Pitchford] agreed to take a polygraph test. So after Investigator Conley left out of the room, I, again, went back through the same rights. I put a checkmark by each one marking [sic] sure that he understood it." Pitchford

_____

[71]551 So. 2d at 169.

[72]542 So. 2d at 239.

argues that, because he did not sign the waiver portion of the *Miranda* form, the waiver of his rights was not voluntary and intelligent. Jennings testified that, after advising Pitchford of his *Miranda* rights and reading the waiver and consent form to him, Pitchford "started crying and he stated that he had been up all night praying." Jennings reminded him that he was there to take a polygraph test, and said "if you lie to us, we are going to know whether or not you are lying about any of this." At that point, Pitchford began to tell Jennings the chain of events that occurred the morning Britt was murdered.

¶115. Officer Conley stepped into the room, at which point Pitchford "quit talking." Conley asked Pitchford, "do you understand what your rights are," and Pitchford said "yes." Conley then asked, "is it your own free will to make a statement?" Pitchford again responded "yes."

¶116. Jennings testified that, when Conley walked into the room, Pitchford reverted to his previous story. He said, "It was kind of obvious that maybe he was not going to talk freely in front of Conley." After Conley stepped back out of the room, Pitchford "told the entire chain of events, which we started from a week and a half prior to right on up to the actual morning of the actual murder and robbery."

¶117. Jennings testified that neither he nor Conley made threats to Pitchford or held out any hope of reward in order to entice him to give the statements. He also testified that Pitchford clearly understood his *Miranda* rights, and there was no indication that he did not freely and voluntarily waive those rights.

¶118. Pitchford asserts that Jennings and Conley created the "'perfect storm' of unconstitutional psychological coercion" by threatening to give Pitchford a polygraph exam, misrepresenting the reliability of the polygraph test, and telling Pitchford that anything said

42

was just between the two of them (i.e., Pitchford and Jennings).  However, the record reveals that Pitchford volunteered to take the polygraph exam, and Jennings testified that he did not threaten Pitchford through misrepresentations of the polygraph's accuracy, but simply indicated to him that the purpose of a polygraph exam -- which he agreed to take -- was to determine truthfulness.  Finally, Jennings admitted telling Pitchford that his confession was "between you and I," but only "after he had given the entire statement."

¶119.  Based on this record, we cannot say that the trial court's ruling regarding these two November 8 statements was against the overwhelming weight of the evidence.  The court said:

> [I]t's the understanding of the Court that the fifth statement was a continuation of the fourth statement.  It was just a situation where Officer Conley was no longer in the room.  I think it could have very easily been called statement four.  For whatever reason they were transcribed at different times and considered five different statements.  But nevertheless, he was properly Mirandised, Mirandised [sic] before the statement was given.

¶120.  The trial judge applied the correct legal standards, his decision was not manifestly in error, and this issue has no merit.

## IX.  ADMISSION OF EVIDENCE CONCERNING PRIOR BAD ACTS

¶121.  Pitchford next argues the State improperly introduced evidence of a prior crime.  Pitchford was indicted for two crimes: (1) capital murder of Rubin Britt in the course of armed robbery, and (2) conspiracy to commit a crime arising out of his previously thwarted attempt to rob Britt's store.  The charges were not consolidated into a multicount indictment, nor were they consolidated into a single trial.

43

¶122. Citing Mississippi Rules of Evidence 404(b) and 403, Pitchford moved to exclude this evidence. The Court allowed Pitchford's counsel to reserve his objection. During a bench conference at trial, the prosecutor requested a Rule 403 balancing test. The trial court ruled as follows:

> As I understand from the motions last week, approximately a week before this alleged crime occurred there was a plan where Mr. Pitchford and others were present intending to go in and rob the . . . Crossroads Grocery. And somehow that plan was thwarted. And a week later the exact same crime was allegedly committed. That seems to me to be under the heading of plans, preparation, motive and the – and admissible as evidence. And so the Court finds that to be highly probative. And the probative value would substantially outweigh any prejudice. So that is testimony the Court will allow.

¶123. Pitchford concedes that evidence of other crimes may be admissible under Rule 404(b) in order to show intent, preparation, plan, or knowledge, or where necessary to tell the complete story so as not to confuse the jury. However, Pitchford disputes the trial court's ruling that the probative value of the evidence outweighed its prejudicial effect.

¶124. The two evidentiary rules at issue are as follows:

> **Other Crimes, Wrongs, or Acts**. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*[73]

and

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[74]

---

[73]Miss. R. Evid 404(b) (emphasis added).

[74]Miss. R. Evid. 403.

¶125. As an initial matter, we note that this Court has, in previous cases, erroneously implied that Rule 404(b) exceptions are not subject to Rule 403 analysis.[75] Today, we clarify those cases and hold that Rule 404(b) exceptions are, indeed, subject to a Rule 403 balancing test.

¶126. The trial court found the evidence admissible under Rule 404(b). Furthermore, the trial court conducted a Rule 403 balancing test, and found "the probative value would substantially outweigh any prejudice."

¶127. A trial court "must exercise sound discretion in determining whether the proffered evidence is relevant under Miss. R. Evid. 401 and even if relevant, whether such relevant evidence is admissible applying the Miss. R. Evid. 403 criteria."[76] Furthermore, this Court has held "that the admission of evidence is well within the sound discretion of the trial court, subject to reversal on appeal only if there be an abuse of that discretion."[77]

¶128. We cannot say the trial court abused its discretion in admitting the evidence under Rules 404(b) and 403 . The trial judge should have stated that he found the evidence was admissible because "the probative value [was] not substantially outweighed by the danger of unfair prejudice,"[78] rather than "the probative value would substantially outweigh any prejudice." But even though the trial judge did not utter the "magic words" of Rule 403, he

---

[75]*See **Jenkins v. State***, 507 So. 2d 89, 92 (Miss. 1987), and its progeny, **Burns v. State**, 729 So. 2d. 203, 222 (Miss. 1998) (quoting **Parker v. State**, 606 So. 2d 1132, 1136-37 (Miss. 1992), *overruled on other grounds by **Goff v. State***, 14 So. 3d 625 (Miss. 2009)).

[76]**Eckman v. Moore**, 876 So. 2d 975, 985 (Miss. 2004).

[77]*Id*. at 984 (citations omitted).

[78]Miss. R. Evid. 403.

clearly performed a Rule 403 analysis and thus did not abuse his discretion in admitting the evidence,[79] and this assignment of error has no merit.

## X.    EXPERT TESTIMONY

¶129.  Pitchford's next assignment of error is that the trial court erroneously allowed the jury to hear opinions from Dr. Steven Hayne, who was tendered by the State – without objection – as an expert in the field of forensic pathology.  Dr. Hayne performed the autopsy on Reuben Britt and testified he had been shot up to three times with a hand gun containing rat shot, and five times with small-caliber rounds, consistent with a .22 caliber weapon.  Dr. Hayne also testified that it would not be inconsistent with the decedent's wounds for him to have been shot one to four times with the .38 caliber weapon recovered from Pitchford.

¶130.  Relying on ***Edmonds v. State***,[80] Pitchford argues Dr. Hayne's testimony concerning the gunshot wound was outside his area of expertise.  In ***Edmonds***, Dr. Hayne provided opinions outside his area of expertise when he testified that the trigger of the murder weapon was likely pulled by two persons, rather than one.[81]

¶131.  The issue before us today is distinguishable from ***Edmonds***.  Dr. Hayne is clearly qualified to provide opinions as to the nature and number of wounds, and whether those wounds are consistent with a .22 caliber cartridge or a .38 caliber ratshot cartridge.  Such

---

[79]*See, e.g.,* ***Tate v. State***, 20 So. 3d 623, 639 (Miss. 2009).

[80]955 So. 2d 787 (Miss. 2007).

[81]*Id.* at 792.

testimony falls squarely within the expertise of a forensic pathologist.[82]  We find this issue has no merit.

¶132.  The second argument Pitchford advances concerning Dr. Hayne is that he should not have been allowed to testify at all because the State failed to show he was "qualified as an expert by knowledge, skill, experience, training, or education."  Pitchford argues that Dr. Hayne's testimony should have been excluded because he incorrectly testified that he was "the state pathologist for the Department of Public Safety Medical Examiner's Office."  Pitchford also argues, based on a newspaper article, that the number of autopsies performed each year by Dr. Hayne "established that the methods he employed were not in conformity with the accepted methods of the profession."

¶133.  Pitchford made no objection to these concerns at trial, and so  they are procedurally barred.  And even if they weren't, this Court  recently addressed a nearly identical argument in *Wilson v. State*[83] and stated:

> Wilson argues that the record reveals Dr. Hayne testified that his position was that of "Chief State Pathologist for the Department of Public Safety" for the State of Mississippi. Wilson correctly points to the fact that there is no such position in Mississippi. According to Wilson, this fact coupled with the criticism Dr. Hayne has received from this Court, should lend itself under heightened-scrutiny review to a finding by this Court that Wilson's due process rights were violated by Dr. Hayne's testimony.
> . . .
>
> We agree with the State that Wilson cites no authority, other than newspaper articles, to support his proposition that we should set aside Wilson's death sentence merely because Dr. Hayne testified in this case. Thus, this Court is

---

[82]*See, e.g. **Holland v. State**, 705 So. 2d 307, 341 (Miss. 1997) ("Thus, in Mississippi, a forensic pathologist may testify as to what produced the injuries in this case. . . .").

[83]21 So. 3d 572, 588-89 (Miss. 2009).

not duty-bound to discuss this issue based on a procedural bar. However, procedural bar notwithstanding, we look briefly to this issue.

. . .

. . .Taken to its logical end, Wilson's argument would mean that this Court should adopt a per se rule that testimony by Dr. Hayne in any case renders the verdict in that case invalid. This argument is simply untenable. Any new evidence that could be developed for the purpose of impeaching Dr. Hayne's findings should be presented in later post-conviction-relief proceedings.

¶134. We find no merit in Pitchford's challenge to Dr. Hayne's qualifications or his testimony in this case.

## XI. JURY INSTRUCTIONS

¶135. Pitchford's eleventh assignment of error is that the trial court erroneously excluded several of his jury instructions and included several of the State's jury instructions. This Court has stated, "jury instructions are within the sound discretion of the trial court."[84]

¶136. Pitchford claims instructions D-9 and D-10 – both of which were cautionary instructions concerning informant testimony – were erroneously excluded. We have discussed these instructions in Issue V *supra*.

¶137. Pitchford also complains that the trial court refused his proposed instruction, D-30. However, the record reveals that Pitchford's counsel withdrew the instruction. We will not hold the trial court in error for failing to give a withdrawn instruction.

¶138. Pitchford complains that the State's proposed instructions S-1, S-2A, and S-3 – which were given to the jury as Instructions 2, 3, and 4 – failed to give any guidance to the jury as to what it should do if it failed to find any of the requisite elements of capital murder and

---

[84]*Rubenstein v. State,* 941 So. 2d 735, 787 (Miss. 2006) (citing *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001)).

armed robbery beyond a reasonable doubt. Instructions 2 and 4 both clearly stated that the jury could not find Pitchford guilty if it did not find that he had committed every element of the crimes beyond a reasonable doubt. Instruction 3 also provided that, in order for the jury to find Pitchford guilty, it had to consider the evidence and find beyond a reasonable doubt that he had committed the elements of the crime of robbery. The instructions at issue clearly required the jury to find Pitchford guilty of each element of the crime, beyond a reasonable doubt, so this assignment of error has no merit.

¶139. Pitchford next complains that the trial court improperly rejected his proposed instruction D-18, which is as follows:

> I instruct you that the law looks with suspicion and distrust on the testimony of an alleged accomplice. The law requires the jury to weigh the testimony of an alleged accomplice with great care and with caution and suspicion.

¶140. Jury Instruction 6, which was presented to the jury, is as follows:

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged accomplice or informant. The law requires the jury to weight the testimony of an alleged accomplice or informant with great care, caution and suspicion.

Pitchford complains that Instruction 6 included both accomplices and informants in the same instruction. While it is true that "[a] defendant is entitled to have his theory of the case presented in the jury instructions,"[85] the entitlement is limited. The court may refuse an instruction if it "is covered fairly elsewhere in the instructions."[86] The trial court was within

---

[85]*Thorson v. State*, 895 So. 2d 85, 107 (Miss. 2004) (citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)).

[86]*Id.*

49

its discretion in denying D-18 as being "fairly included elsewhere," so this assignment of error has no merit.

¶141. Pitchford also complains that his instruction D-34 was improperly denied by the trial court. D-34, as proposed, is as follows:

> Each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

¶142. The trial court denied this instruction as repetitive, saying, "I think this is like the third time too that I have had this instruction . . . maybe not the exact wording, but it's very close to others that I've already looked at." The judge continued: "The S-instructions [sic] already telling them what they must prove. And unless the state has proved all those elements then, beyond a reasonable doubt, they can't convict on -- based on other instructions already given."

¶143. Pitchford argues that the instruction was necessary because *Sandstrom v. Montana*[87] requires that the jury not "make more than one leap from what is proven beyond a reasonable doubt to what is inferred." However, the Supreme Court clearly laid out the issue in *Sandstrom*:

> The question presented is whether, in a case in which intent is an element of the crime charged, the jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," violates the Fourteenth

---

[87]442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).

Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt.[88]

¶144. Unlike the issue in *Sandstrom*, no legal presumptions operate against Pitchford. So *Sandstrom* is inapplicable and this assignment of error has no merit.

## XII.   MITIGATION-PHASE ARGUMENTS AND EVIDENCE

¶145. Pitchford's next assignment of error is that the trial court improperly disallowed mitigation evidence that would have allowed him to avoid the death penalty. Pitchford points to three instances.

*Effect of Pitchford's death on his child*

¶146. The defense attempted to solicit testimony from Dominique Hogan, the mother of Pitchford's two-year-old son, about the effect Pitchford's death would have on the child. The trial court sustained the State's objection to the evidence.

¶147. This Court has held that "[e]vidence of a criminal defendant's death and the effect it would have on the life of his family is not relevant and is properly excluded since such evidence does not impact on the defendant's character, the record, or the circumstances of the crime."[89] Pitchford cites expansive language in *Tennard v. Dretke*[90] for the proposition that the exclusion of this testimony violated his rights under the Eighth Amendment.

---

[88]*Id.* at 512.

[89]*Jordan v. State*, 786 So. 2d 987, 1020 (Miss. 2001) (citing *Wilcher v. State*, 697 So. 2d 1123, 1133-34 (Miss. 1997)).

[90]542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004).

*Tennard* held "[a] State cannot preclude the sentencer from considering 'any *relevant* mitigating evidence' that the defendant proffers in support of a sentence less than death."[91]

¶148.  However, as we held in ***Jordan***, how the death of a defendant will impact others is simply not relevant as mitigating evidence, and nothing in ***Tennard*** contradicts this.  This argument has no merit, and the trial judge committed no error by excluding this irrelevant testimony.

*Videotape*

¶149.  Pitchford also wanted to produce a "day-in-the-life" video of himself and his son interacting.  However, the jail where Pitchford was incarcerated awaiting trial refused to allow Pitchford to produce the video, as it was against jail policy.  Pitchford filed an ex-parte, pretrial motion asking the Court to order the Sheriff to allow Pitchford to produce the video.  The trial judge refused to grant the motion, stating at the hearing, "I'm not going to override the policy of the jail. If they want to voluntarily let you in and film that and then – I'd consider it at the appropriate time whether I would admit something like that . . . . But I'm not going to start micro-managing the jail and tell them how to they need to operate it."

¶150.  Pitchford argues now that "it was reversible error for the trial court to prevent this evidence from being obtained."  However, Pitchford cites no authority for the proposition that the trial judge was required to compel its production.  Pitchford was advised by the court that if he was able to make such a video, it would rule on the admissibility of such evidence

---

[91]***Id.*** at 285 (citations omitted) (emphasis added).

at the proper time.  As Pitchford has presented no relevant authority in support of his argument, it is dismissed.[92]

*Family's reaction to father's death*

¶151.  Pitchford's next argument is that the trial court erred by refusing to permit him to put into context the mitigation evidence about how he reacted to his father's illness and death. He wanted to introduce information about how the family unit as a whole reacted by eliciting testimony from his brother and mother.  The proffered testimony from Pitchford's brother, which the trial court refused to allow, was as follows:

Q:      Okay.  How old were you when your dad died?

A:      Ten years old.

Q:      What effect – how did it make you feel?

A:      I was just – I was lacking somebody in my life.

STATE:      Objection, Your Honor.  Your Honor, that has nothing to do with what we are here for today.  I have tried not to object but this trial is not on what sentence their father should get.  It is on what sentence this defendant should get.  I would ask that any mitigation relate to this defendant and not something –

DEFENSE:      It is going to relate, Your Honor.  It is going to directly towards the defendant.

STATE:      He also asked how this witness felt, which has absolutely nothing to do with the defendant.

THE COURT:  I'll sustain.

¶152. The proposed testimony from Pitchford's mother, which the trial court refused to allow, was as follows:

---

[92]***Brawner v. State***, 947 So. 2d 254, 269 (Miss. 2006).

53

Q:     And you remember when Terry's father died; is that correct?

A:     Yes.

Q:     And how did that affect Terry?  Before you answer that Miss Jackson, what kind of relationship did Terry and his dad have?

A:     They had a real close relationship.  Terry's a twin.  And he had – it was the last twin, the kids that he had.  His daddy was 57 years old, and he was so proud of those twin boys that he had had.  He always said that there is nowhere in the world that I can go that I can't take my boys.  And when he was diagnosed with kidney cancer, Dr. Armstrong sent him to Oxford, Mississippi.  And he told me –

STATE:     Your Honor, I object.  What her and her husband –

DEFENSE:  Your Honor –

STATE:     – talked about is not relevant

DEFENSE:  – mitigation –

STATE:     May I finish my objection, Your Honor?  What her and her husband talked about is not relevant on mitigation for this defendant.
           . . .

COURT:     Well, I think you just at this point need to restate your question.  And I mean – she was getting into an issue of how – what Dr. Armstrong said and how it affected her and Mr. Jackson.

DEFENSE:  Yes, sir.  I understand that.  I don't think I asked that.

¶153.  Because the testimony did not relate to "defendant's character, the record, or the circumstances of the crime,"[93] the trial court properly excluded it.

## XIII.  PRESENTATION OF IMPROPER MATTERS TO JURY DURING PENALTY PHASE

---

[93]*Jordan*, 786 So. 2d at 1020.

¶154. Pitchford's next assignment of error is that the trial court erred by allowing improper evidence during the penalty phase of the trial. He points to three instances of purported error.

*Victim-impact testimony*

¶155. Pitchford's first argument is a general allegation, without a citation to the record, that the court permitted the jury to hear victim-impact testimony beyond the scope allowed by the law. ***Payne v. Tennesee*** abolished the per se rule against victim-impact testimony, subject to the limitation that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."[94] Pitchford also cites ***Randall v. State***[95] for the proposition that members of the victim's family were permitted to give evidence about the decedent beyond that which "was relevant to the crime charged." After reviewing testimony of Nettie Britt (the decedent's wife) and Kim Lindley (his daughter), we find nothing to support Pitchford's argument.

*Hearsay*

---

[94]501 U.S. 808, 825, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).

[95]806 So. 2d 185, 225 (Miss. 2001).

¶156. During the course of her testimony, Nettie Britt was allowed, over objection by the defense,[96] to read a letter[97] written by her great-niece. Pitchford argues that this violated his Sixth Amendment right to confront a witness against him under ***Crawford v. Washington***.[98]

¶157. The United States Supreme Court has not yet ruled on whether ***Crawford*** extends to the sentencing phase of a trial. While we are aware of federal authority that the Sixth Amendment does not apply at sentencing proceedings,[99] this Court's precedent holds otherwise.[100]

---

[96]MR. CARTER: Your Honor, I want to object to the reading of this letter. It essentially lets somebody else testify who is not even here. And based on that and based on the fact that I haven't even seen the letter, I don't know if anything is in there that is objectionable. . . .
   [Mr. Carter was then allowed to read the letter]

[97]The letter contained an affectionate description of her memories of   "Uncle Bubba" (Reuben Britt).

[98]541 U.S. 36, 124 S .Ct. 1354, 158 L. Ed. 2d 177 (2004).

[99]The Fifth Circuit concluded that the Sixth Amendment does not apply, even in capital cases. ***U.S. v. Fields***, 483 F.3d 313, 324-339 (5th Cir. 2007) ("we conclude that the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's selection decision"); ***U.S. v. Mitchell***, 484 F.3d 762, 776 (5th Cir. 2007) (citing ***United States v. Navarro***, 169 F.3d 228, 236 (5th Cir.1999) ("[T]here is no Confrontation Clause right at sentencing . . . . "). Other federal appellate courts considering this matter have reached the same conclusion. *See e.g.,* ***United States v. Stone***, 432 F.3d 651, 654 (6th Cir. 2005) ("Because ***Crawford*** was concerned only with testimonial evidence introduced at trial, ***Crawford*** does not change our long-settled rule that the confrontation clause does not apply in sentencing proceedings"); ***United States v. Luciano***, 414 F.3d 174, 178-80 (1st Cir. 2005) ("Nothing in ***Crawford*** requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing."); ***United States v. Martinez***, 413 F.3d 239, 242-43 (2d Cir. 2005) ("[***Crawford***] provides no basis to question prior Supreme Court decisions that expressly approved the consideration of out-of-court statements at sentencing.").

[100]*See* ***Lanier v. State***, 533 So. 2d 473, 488 (Miss. 1988) (state and federal constitutions guarantee a defendant the right to confront witnesses against him during the sentencing phase of a trial); *see also* ***Wilson v. State***, 21 So. 3d 572, 586-87 (Miss. 2009).

¶158. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[101] Article 3, Section 26 of the Mississippi Constitution also provides that, "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him."

¶159. In *Lanier*, the defendant was found guilty of capital murder.[102] During the sentencing phase, the trial court allowed the prosecution to cross-examine a defense witness with a letter written by two doctors from the Mississippi State Hospital at Whitfield.[103] The prosecutor was not impeaching the witness with the letter, but rather was using the letter to "suggest that others (more competent that the witness) disagreed with the witness' conclusion -- for the purpose of disproving the witnesses conclusion."[104] The letter was neither entered into evidence nor discussed during the guilt phase of the trial.[105]

¶160. On appeal, Lanier alleged that the use of the letter was a violation of the Confrontation Clause of the Sixth Amendment.[106] This Court held "[t]he right of a criminal defendant . . . to cross examine the witnesses against him is at the heart of the confrontation clause."[107] The Court further held that

---

[101]U.S. Const. amend. VI.

[102]*Lanier*, 533 So. 2d at 476.

[103]*Id.* at 486.

[104]*Id.* at 487.

[105]*Id.*

[106]*Id.*

[107]*Id.* at 488.

the manner in which the State utilized the Whitfield letter afforded Lanier no opportunity to cross-examine the conclusions of the several doctors. The letter as previously noted was obviously violative of our hearsay rules. But, over and about the fact that the letter was in the present case was inadmissible hearsay, *the confrontation clause acts so as to even restrict proof which under our evidence rules would be classified as 'admissible hearsay.'*[108]

¶161. In this case, the trial court erred in allowing Nellie Britt to read the letter written by her great-niece. Just as in **Lanier**, Pitchford had no opportunity to cross-examine the author of the letter. However, after carefully reviewing the contents of the letter, in light of the totality of the evidence presented during the sentencing phase, we conclude that the error was harmless.

*State arguments*

¶162. Pitchford's third argument is that the trial court improperly allowed the State to make a statement. After the State had finished its case during the penalty phase, the following occurred as the defense attempted to make an opening statement:

| MR. CARTER: | I want to make an opening before I do it. It should only take two or three minutes. It is perfectly fine for Mr. Evans to put his witness on the stand. I am not waiving mine. |
| MR. EVANS: | I am not waiving mine. |
| MR. CARTER: | I have a right to do it. It will only take me two or three minutes before I call a witness. |
| MR. EVANS: | I am not waiving anything. It is my understanding that nobody asked for an opening statement. |
| MR. CARTER: | I am asking for one. |
| THE COURT: | I'll give you two minutes. |
| MR. EVANS: | I'd like to do mine when he gets through then, Your Honor. |
| MR. CARTER: | You waived it. |
| MR. EVANS: | No, I haven't. I wasn't given an opportunity. |
| . . . | |

---

[108]*Id.* (citing **Lafave** and **Israel**, *Criminal Procedure* § 23.3(d,877) (1985).

THE COURT: If you give one, you are going to give it before he goes forward with his. After the defense gives an opening statement – well, I mean what I'm saying is procedurally the State goes first on opening statements. So if the defense wants to make an opening, then the State wants to. Then you can.

MR. CARTER: Let me just say for the record that we object to Mr. Evans at this point making an opening statement as he has already called witnesses and put on his case and did not make one. Now, he has a right to make a closing statement, just as I do. But he does not have a right to make an opening statement after he called all witnesses and rested.

THE COURT: Well, it's my opinion that, that when neither side asked for an opening statement when this Court proceeded, I considered that it was waived. I've never seen opening statements at this phase of the trial.

MR. CARTER: I do them in every case, Your Honor.

THE COURT: Well, I have never seen it.

MR. EVANS: I've never seen it either.

THE COURT: So I considered it waived. But in fairness to the prosecution, if the defense wishes to make one, then I think the prosecution has a right to make one.

¶163. Pitchford argues that this was error and an abuse of discretion, citing *McFadden v. Mississippi State Board of Medical Licensure*.[109] In *McFadden*, which involved an appeal from an administrative hearing, this Court stated:

> Dr. McFadden also suggests that because there were no opening arguments in this case this somehow contributed to the alleged denial of his due process rights. First, it should be noted Dr. McFadden made no contemporaneous objection to the Board's decision to waive opening statements. Second, opening statements are often waived in cases where there is already a general understanding of the issues to be addressed. Therefore, we conclude this argument is without merit.[110]

---

[109]735 So. 2d 145, 160 (Miss. 1999).

[110]*Id.*

We find *McFadden* inapposite to this matter. As Pitchford has presented no relevant authority in support of his argument, it is dismissed.[111]

## XIV. WHETHER THE SENTENCING PHASE INSTRUCTIONS WERE DEFICIENT.

¶164. Pitchford's fourteenth assignment of error is that Sentencing Instruction 1 did not expressly inform the jury that, even though it might find the aggravating factors outweighed the mitigating circumstances, it could nevertheless sentence him to life. He claims the trial court should not have refused his proposed instruction DS-7, which stated:

> You may find that death is not warranted even if there are one or more aggravating circumstances and not a single mitigating circumstance. You are not required to find any mitigating circumstances in order to return a sentence of life imprisonment. Nor does the finding of an aggravating circumstance, require that you return a sentence of death. You, as a juror, always have the option to sentence Pitchford to life imprisonment, whatever findings you may make.

¶165. As stated above, "jury instructions are within the sound discretion of the trial court."[112] On review, jury instructions should be read together, taken as a whole, and no one instruction should be taken out of context.[113] A defendant is entitled to have his theory of the case presented in the jury instructions.[114] But the entitlement is limited, and the court may

---

[111]*Brawner v. State*, 947 So. 2d 254, 269 (Miss. 2006).

[112]*Rubenstein v. State,* 941 So. 2d 735, 787 (Miss. 2006) (citing *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001)).

[113]*Thorson*, 895 So. 2d at 107 (citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)).

[114]*Id.*

refuse an instruction if it "incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence."[115]

¶166. Sentencing Instruction 1 reads, in pertinent part:

> [T]o return the death penalty, you must find the mitigating circumstances – those which tend to warrant the less severe penalty of life imprisonment without parole – do not outweigh the aggravating circumstances – which tend to warrant the death penalty . . . . If none of the aggravating circumstances are found to exist, the death penalty may not be imposed . . . . If one or both of the . . . aggravating circumstances are found to exist beyond a reasonable doubt, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances . . . . If you find from the evidence that one or more of the . . . elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) any aggravating circumstances you previously found. In the event that you find that the mitigating circumstance[s] do not outweigh or overcome the aggravating circumstance, you may impose the death sentence. Should you find the mitigating circumstance(s) outweigh or overcome the aggravating circumstances, you shall not impose the death sentence.

¶167. The instruction does not require the jury to impose the death penalty, even should it find the aggravating factors outweighed the mitigating circumstances. The instruction merely informs the jury that, should it find "the mitigating circumstance[s] do not outweigh or overcome the aggravating circumstance, [it] *may* impose the death sentence." The trial court's use of the term "may" – while not the strongest language to make the point – was sufficient to convey to the jury that it was not required to impose the death penalty, even should it find the aggravating factors outweighed those submitted in mitigation.

¶168. Furthermore, this Court has specifically held, "a defendant is not entitled to an instruction that the jury may return a life sentence even if the aggravating circumstances outweigh the mitigating circumstances or if they do not find any mitigating

---

[115]*Id.*

61

circumstances."[116]  Based on the trial court's instruction and our precedent, we find this

argument has no merit.

¶169.  Pitchford also asserts that the trial court erred in failing to give four of his proposed

sentencing instructions, which are as follows:

> **DS-8**: The Court instructs you, the jury, that if you cannot, within a reasonable amount of time, agree as to punishment, the Court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole.

> **DS-13**: I have previously read to you the aggravating circumstances which the law permits you to consider.  These are the only aggravating circumstances you may consider.  However before you may consider any of these factors you must find that factor is established by evidence beyond a reasonable doubt.

> **DS-15**: If you the Jury chooses [sic] to sentence Mr. Pitchford to life imprisonment without the possibility of parole, Mr. Pitchford will never be eligible for parole.  Further, his life sentence without possibility of probation or parole cannot be reduced or suspended.

¶170.  The Supreme Court of the United States has said, "as a requirement of individualized

sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation,

and that a state statute that permits a jury to consider any mitigating evidence comports with

that requirement."[117]  The Court also pointed out that:

> while the Constitution requires that a sentencing jury have discretion, it does not mandate that discretion be unfettered; the States are free to determine the manner in which a jury may consider mitigating evidence.  So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death.[118]

---

[116]***King v. State***, 960 So. 2d 413, 442 (Miss. 2007) (citing ***Holland v. State***, 705 So. 2d 307, 354 (Miss. 1997), ***Hansen v. State***, 592 So. 2d 114, 150 (Miss. 1991), ***Goodin v. State***, 787 So. 2d 639, 657 (Miss. 2001), ***Foster v. State***, 639 So. 2d 1263, 1301 (Miss. 1994)).

[117]***Kansas v. Marsh***, 548 U.S. 163, 171, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

[118]*Id.*

¶171. Pitchford correctly argues that DS-8 complies with the letter of Mississippi Code Section 99-19-103.[119] Still, the trial court was within its discretion to deny the instruction, reasoning, "[t]his would indicate to the jury that a certain deadline was going to be set for them and after that they couldn't – that the case would be taken away from them." We will not hold the trial court in error for refusing the instruction.

¶172. The trial court refused DS-13 as cumulative, stating,

> [The jury] has already been instructed that they are cautioned not to be swayed by, among other things, prejudice. . . . [The jury instruction] also tells them what factors they have to use. And so I don't think they need to be told what factors they don't have to use since they have already been told which factors they do have to use.

¶173. The trial court was within its discretion to deny DS-13 as "covered fairly elsewhere" under *Thorson*.[120]

¶174. As to DS-15, the trial court held: "S-1A already tells them that it's either life without parole or death penalty. So [the jury] is aware of that. And I don't see that DS-15 needs to be given. It's already been, been given once." Pitchford nevertheless argues that, without a more specific instruction, the jury was left to speculate as to whether he actually would be sentenced to spend the remainder of his natural life behind bars.

¶175. This Court has said a trial court's "failure to include the statutorily required sentencing option of *life without the possibility of parole* constitutes reversible error."[121] Here, however, the trial court clearly included an instruction that Pitchford could be

---

[119]*See* Miss. Code Ann. § 99-19-103 (Rev. 2007).

[120]895 So. 2d at 107.

[121]*Rubenstein,* 941 So. 2d at 793 (emphasis added).

63

sentenced to "life imprisonment without parole." Thus, we find the trial court was within its discretion to deny DS-15, as it was "fairly covered elsewhere" under ***Thorson***.

¶176. Pitchford complains that two critical instructions – one regarding a verdict of life without parole, and the other concerning what the jury was to do in the event it was unable to agree unanimously on a sentence – were on a separate page from the instructions concerning a possible death sentence. He claims this possibly suggested to the jury that death was the preferred sentence.

¶177. The trial court, responding to this argument, evaluated the form of the instructions and found that, "[i]t is not in the least bit suggestive they are to do one over the other." We agree, and find no merit to this argument.

¶178. Finally, Pitchford argues that the trial court erred in failing to allow the mitigating factor – "Mr. Pitchford had mental health problems as a child that were never treated" – to be considered by the jury. When presented with this argument, the trial court stated, "The fact is we don't have any doctor that has testified to that. We don't have anything in the record that at all supports that Pitchford had any mental health problems."

¶179. We will not hold the trial court in error for refusing to submit a mitigating factor to the jury which was not grounded in the evidence. Thus, this issue has no merit.

## XV. WHETHER THE DEATH PENALTY VIOLATES THE CONSTITUTION OF THE UNITED STATES.

¶180. Pitchford next argues that his death sentence must be vacated because it violates the Constitution of the United States.

***Baze v. Rees***

64

¶181. Pitchford first argues that his execution by lethal injection would be in violation of the Eighth Amendment prohibition against cruel and unusual punishment, based on *Baze v. Rees*.[122] This argument repeatedly has been rejected by this Court. As we recently stated in *Goff v. State*:

> On April 16, 2008, the United States Supreme Court decided *Baze v. Rees*, upholding the State of Kentucky's lethal-injection protocol as not being violative of the Eighth Amendment. *Baze v. Rees*, --- U.S. ----, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). In so doing, Chief Justice Roberts's plurality opinion announced the standard which we must use to determine whether our method of execution violates the Eighth Amendment. *Id*. The Supreme Court's plurality found that cruel and unusual punishment occurs where lethal injection as an execution method presents a "substantial" or "objectively intolerable risk of serious harm" in light of "feasible, readily implemented" alternative procedures. *Id*. at 1531, 1532. However, the analysis was focused on the manner of lethal injection, and did not question the validity of lethal injection or the constitutionality of the death penalty as such. *Id*. at 1537. The *Baze* Court held: Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States . . . [which] if administered as intended . . . will result in a painless death. The risks of maladministration . . . such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel -- cannot be remotely characterized as "objectively intolerable." Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment. *Baze*, 128 S. Ct. at 1537.

> For "the disposition of other cases uncertain," Justice Roberts clearly stated that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets [the 'substantial risk'] standard." *Id*. at 1537 (emphasis added).

> If differences exist between Mississippi's execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi's lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop's Eighth-Amendment challenge to Mississippi's lethal-injection procedures, recently announced that "Mississippi's lethal injection protocol appears to be

---

[122]553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008).

substantially similar to Kentucky's protocol that was examined in ***Baze***." ***Walker v. Epps***, 287 Fed. Appx. 371, 2008 WL 2796878, 2008 U.S. App. LEXIS 15547 at [*13] (5th Cir. Miss. July 21, 2008). We agree with the Fifth Circuit's analysis, and hold that Bennett's Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.[123]

¶182. Based on our reasoning in ***Goff***, we hold this argument has no merit.

*Failure to Include Aggravating Circumstances in Indictment*

¶183. The indictment against Pitchford stated that

> on or about the 7th day of November 2004, in Grenada County, Mississippi and within the jurisdiction of this Court, while acting in concert with another or while aiding, abetting, assisting or encouraging another, did willfully, feloniously, intentionally, without authority of law and with or without the deliberate design to effect death, kill and murder Reuben Britt, a human being, while engaged in the felony crime of ARMED ROBBERY, as set forth in section 97-3-79 of MISS. CODE ANN. and in violation of section 97-3-19 (2) (e) MISS. CODE ANN. as amended, and against the peace and dignity of the State of Mississippi.

¶184. Relying on ***Apprendi v. New Jersey***[124] and ***Ring v. Arizona,***[125] Pitchford argues that the indictment failed to charge all elements necessary to impose the death penalty. This Court repeatedly has held that "these cases have no application to Mississippi's capital murder sentencing scheme."[126] As this Court recently stated:

> This Court repeatedly has rejected this type of argument. We have held that ***Apprendi*** and ***Ring*** address issues wholly distinct from the present one, and in fact do not address indictments at all. The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense. An indictment is required only

---

[123]***Goff v. State***, 14 So. 3d 625, 665-66 (Miss. 2009) (quoting ***Bennett v. State***, 990 So. 2d 155, 160-61 (Miss. 2008)).

[124]530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[125]536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[126]***Hodges v. State***, 912 So. 2d 730, 775 (Miss. 2005).

66

to have a clear and concise statement of the elements of the crime with which the defendant is charged.

Under Mississippi law, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. In addition, "[o]ur death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment."

When Goff was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the mens rea standard that was required.[127]

¶185. Pitchford argues this Court's previous holdings are clearly erroneous in light of *Kansas v. Marsh*[128] because, according to Pitchford:

[O]n the way to reaching its conclusion the Court compared the Kansas scheme to the Arizona scheme and found them essentially the same. Mississippi's scheme is indistinguishable from Kansas. Thus the position that *Ring v. Arizona* has no application to Mississippi's scheme, is incorrect.

¶186. We find *Marsh* doesn't apply and this argument has no merit.

*Dual use of robbery as capitalizer and aggravator*

¶187. Pitchford next urges this Court to revisit its prior holdings allowing the use of an underlying felony to both elevate the crime to capital murder and to act as an aggravating circumstance.[129]  After reviewing the matter, we find no compelling reason to reverse our position on this matter and, thus, we decline to do so.

*Enmund* **And** *Tison*

---

[127]*Goff*, 14 So. 3d at 665 (citations omitted).

[128]548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

[129]*See e.g.* **Ross v. State**, 954 So. 2d 968, 1014 (Miss. 2007) ("The use of the underlying felony as an aggravator was not error.").

67

¶188. Pitchford's final assignment of error on this issue is that the verdict returned against him violates the holding in ***Enmund v. Florida***[130] and ***Tison v. Arizona***.[131] These cases hold that the death penalty may not be imposed on a defendant who aids and abets, but who did not commit the murder, unless the defendant attempted to commit the murder, intended that the murder take place, or understood that lethal force would, or might, be used in the commission of the underlying felony.

¶189. The jury unanimously found that Pitchford actually killed Reuben Britt, attempted to kill Reuben Britt, intended the killing of Reuben Britt, and contemplated that lethal force would be employed. Pitchford argues that the testimony showing he personally killed, attempted to kill, or intended to kill Reuben Britt was admitted in error, namely the testimony discussed in Issues V and IX, *supra*. As previously discussed, however, we found no error with respect to those issues and so this argument has no merit.

## XVI. WHETHER THE DEATH SENTENCE IN THIS CASE IS CONSTITUTIONALLY OR STATUTORILY DISPROPORTIONATE.

¶190. This Court is required by statute to perform a proportionality review when reviewing the imposition of a death sentence. Mississippi Code Section 99-19-105(3) states:

(3) With regard to the sentence, the court shall determine:

    (a)    Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

    (b)    Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

---

[130]458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).

[131]481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987).

(c)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . .[132]

¶191. Pitchford submits neither argument nor evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. After reviewing the record in this appeal, we cannot say the record establishes that Pitchford's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.[133]

¶192. Furthermore, we find there was sufficient evidence to support the jury's finding of the statutory aggravating circumstance enumerated by Mississippi Code Section 99-19-101(d) ("The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery. . .").

¶193. Pitchford argues that the death penalty would be disproportionate in this case. He argues that, under the evidence to support the conviction, the admissible proof shows that "Mr. Pitchford was a willing participant in a robbery, but that his co-defendant initiated the fatal conduct in an act of panic when he saw the decedent with a gun and Mr. Pitchford only inflicted separate, non-lethal injuries." He also argues that the death penalty would be disproportionate in this case because Pitchford's accomplice, Eric Bullins, who was sixteen years old at the time of the crime, accepted a plea of manslaughter and is serving a sentence of forty years.

---

[132]Miss. Code Ann. § 99-19-105(3) (Rev. 2007).

[133]*See* Miss. Code Ann. § 99-19-105(3)(a) (Rev. 2007).

¶194. Taking at face value Pitchford's claim that he fired the .38 weapon loaded with rat shot at Reuben Britt only after Bullins fired the "lethal" shots from the .22 weapon, we nevertheless find Pitchford's argument without merit. After comparing the facts of this case with factually similar cases in which the death penalty has been imposed, we find the death sentence in this case is neither excessive nor disproportionate. This Court has upheld the sentence of death for murder committed in the course of a robbery.[134] In **Bishop v. State**,[135] this Court found:

> The record shows that, after Gentry had been hit in the head with the hammer for the first time, Bishop chased after him and brought him back. When Bishop saw Gentry hit with the hammer he knew deadly force was being used. When he ran Gentry down and held Gentry as he was being struck by Jessie, he became more of a principal in the crime. A jury could have easily found that Bishop killed, intended to kill, or at least contemplated that deadly force would be used. This case is not like a robbery where someone is killed on impulse. Bishop took an active role in the killing.[136]

¶195. This Court further found that Bishop's involvement was enough to justify the death penalty, even if the actual killer did not receive it.[137] Similarly, even accepting as true Pitchford's version of the robbery, he took an active role in the killing when he shot Reuben Britt with the .38 pistol. Bullins's successful plea negotiation does not make the death penalty in this case constitutionally or statutorily disproportionate.

---

[134]*See, e.g., **Doss v. State***, 709 So. 2d 369, 401 (Miss. 1996) (holding conviction and sentence appropriate where a grocery store clerk was shot and killed during the course of a robbery); **Cabello v. State**, 471 So. 2d 332, 350 (Miss. 1985).

[135]812 So. 2d 934 (Miss. 2002).

[136]*Id.* at 948-49.

[137]*Id.*

## XVII. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS OF THE TRIAL COURT MANDATES REVERSAL.

¶196. Pitchford argues that the cumulative effect of errors mandates reversal. This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that independently would not require reversal.[138] After a thorough review of the record and briefs, we do not find the cumulative effect of the individual errors denied Pitchford a fundamentally fair trial, so this issue has no merit.

### CONCLUSION

¶197. We affirm the conviction and sentence in this case.

¶198. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**GRAVES, PRESIDING JUSTICE, DISSENTING:**

¶199. "[V]oir dire [often] has become an exercise in finding race-neutral reasons to justify racially motivated strikes. As Justice Marshall predicted, '[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge.'" *Howell v. State*, 860 So. 2d 704, 766 (Miss. 2003) (Graves, J., dissenting) (quoting *Batson v. Kentucky*, 476 U.S. 79, 105, 106 S. Ct. 1712, 1727, 90 L. Ed. 2d 69 (1986) (Marshall, J., concurring)). In the instant case, peremptory challenges were used to exclude African-

---

[138]*Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991).

Americans from the jury. Therefore, I disagree with the majority's finding that the State did not discriminate on the basis of race during jury selection. Because I would reverse the trial court pursuant to *Batson*, I respectfully dissent.

¶200. Under *Batson*, a party who objects to a peremptory strike must establish a prima facie case of purposeful discrimination as follows:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Batson*, 476 U.S. at 96 (citations omitted). However, as this Court has acknowledged, this test was somewhat modified by the U.S. Supreme Court in *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

> In that case the Supreme Court held that Powers, a white, had standing to challenge the exclusion of black jurors on the grounds that the equal protection right of the juror to serve was protected by *Batson*. *Powers*, 499 U.S. at 406, 111 S. Ct. 1364. Essentially, this means that step three above becomes the pivotal inquiry to determine a prima facie case, as this Court recognized in *Davis v. State*, 660 So. 2d 1228, 1240 (Miss. 1995), cert. denied, 517 U.S. 1192, 116 S. Ct. 1684, 134 L. Ed. 2d 785 (1996). Specifically, the pivotal question is whether the opponent of the strike has met the burden of showing that proponent has engaged in a pattern of strikes based on race or gender, or in other words "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94, 106 S. Ct. 1712.

*Randall v. State*, 716 So. 2d at 587 (Miss. 1998). Pursuant to the third step, "[t]his Court has examined the number of strikes on a particular class, the ultimate ethnic or gender makeup of the jury, the nature of questions asked during the voir dire, and the overall demeanor of

72

the attorney." *Id*. (citing *Coleman v. State*, 697 So. 2d 777, 786 (Miss. 1997); *Davis*, 660 So. 2d at 1263 (Banks, J., concurring); *Mack v. State*, 650 So. 2d 1289, 1299 (Miss. 1994), *cert. denied*, 516 U.S. 880, 116 S. Ct. 214, 133 L. Ed. 2d 146 (1995)). "Additionally, '[t]he [opponent of the strike] may also rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.'" *Id*. (citing *Batson*, 476 U.S. at 80, 106 S. Ct. at 1714)).

¶201. Once the defendant has established a prima facie case of discrimination, the burden shifts to the State to provide a race-neutral reason for each strike. *Batson*, 476 U.S. at 97. The trial court then makes a determination of whether the defendant has established purposeful discrimination. *Id.* at 98. The Fifth Circuit Court of Appeals has explained this portion of the test as follows:

> The "shifting burden" described in the *Batson* framework is one of production only. The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination. At the second stage of the *Batson* framework where the party accused of discrimination must articulate a race-neutral explanation for the peremptory challenges – the issue is merely the facial validity of the explanation. "Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral."

*U.S. v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993) (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L. Ed. 2d 395, 396 (1991)). With regard to the third stage of the *Batson* framework, where the trial court must determine whether the defendant has established purposeful discrimination, the Fifth Circuit said:

> In a typical peremptory challenge inquiry, the decisive question will normally be whether a proffered race-neutral explanation should be believed. *See United States v. Johnson*, 941 F.2d 1102, 1108 (10th Cir. 1991). There will seldom be any evidence that the claimant can introduce – beyond arguing that

the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities.

*Bentley-Smith*, 2 F.3d at 1373-74.

¶202. This Court has held that, in reviewing a *Batson* claim, we will not overrule a trial court unless the record indicates the decision was clearly erroneous or contrary to the overwhelming weight of the evidence. *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007). *See also Thorson v. State*, 721 So. 2d 590, 593 (Miss. 1998).

¶203. This Court has specified five indicia of pretext for use in analyzing a proffered race-neutral reason for peremptory strikes:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; . . . (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Lynch v. State*, 877 So. 2d 1254, 1272 (Miss. 2004) (citations omitted).

¶204. In the instant case, Pitchford objected as follows:

> We would object on the grounds of *Batson v. Kentucky* that it appears there is a pattern of striking almost all of the available African-American jurors. They have tendered one African-American juror out of the five that have thus far – four that have thus far arisen on the venire. As we had noted previously, due to the process of cause challenges, particularly death qualification challenges, this is already a disproportionally white jury for the population of this county. And we make a *Batson* challenge. It appears to be a pattern of disproportionately challenging African-American jurors.

¶205. The State used four of seven peremptory strikes against African-Americans on the venire. Thus, only one African-American out of fourteen jurors, including alternates, was seated on Pitchford's jury in Grenada County. Based on this, the trial court correctly found

74

that Pitchford had established a prima facie case for racial discrimination and required the

State to provide race-neutral reasons for the strikes.[139]  The State then offered these reasons:

> MR. EVANS (District Attorney): Yes, sir.  S-2 is black female, juror number 30.  She is the one that was 15 minutes late.  She also, according to police officer, police captain, Carver Conley, has mental problems.  They have had numerous calls to her house and said she obviously has mental problems.
> Juror number S-3 –
> THE COURT: That would be race neutral as to – as to that juror.
> MR. EVANS: S-3 is a black male, number 31, Christopher Lamont Tillmon.  He has a brother that has been convicted of manslaughter.  And considering that this is a murder case, I don't want anyone on the jury that has relatives convicted of similar offenses.
> THE COURT: What was his brother's name?
> MR. EVANS: I don't even remember his brother.  He said that he had a brother convicted of manslaughter.
> THE COURT: On that jury questionnaire?
> MR. EVANS: Yes, sir.
> THE COURT: I find that to be race neutral.  And you can go forward.
> MR. EVANS: S-4 is juror number 43, a black female, Patricia Anne Tidwell.  Her brother, David Tidwell, was convicted in this court of sexual battery.  And her brother is now charged in a shooting case that is a pending case here in Grenada.  And also, according to police officers, she is a known drug user.
> THE COURT: During voir dire, in fact, I made a notation on my notes about her being kin to this individual.  I find that to be race neutral.
> MR. EVANS: Juror number 5 is juror number 48 on the list, a black male, Carlos Ward.  We have several reasons.  One, he had no opinion on the death penalty.  He has a two-year-old child.  He has never been married.  He has numerous speeding violations that we are aware of.
> The reason that I do not want him as a juror is he is too closely related to the defendant.  He is approximately the age of the defendant.  They both have children about the same age.  They both have never been married.  In my opinion he will not be able to not be thinking about these issues, especially on the second phases.  And I don't think he would be a good juror because of that.

---

[139] Since the prosecutor offered an explanation for the peremptory challenges and the trial court ruled on the ultimate question of intentional discrimination, the issue of whether Pitchford made a prima facie showing of discrimination is moot. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395, 396 (1991) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)).

THE COURT: The Court finds that to be race neutral as well. So now we will go back and have the defense starting at 37.

¶206. When the jury was seated, counsel for Pitchford renewed the **Batson** objection and stated:

> MS. STEINER [defense counsel]: At some point the defense is going to want to reserve both its **Batson** objection and a straight for Tenth Amendment racial discrimination.
> THE COURT: You have already made it in the record so I am of the opinion it is in the record.
> MS. STEINER: I don't want to let the paneling of the jury go by without having those objections.
> THE COURT: I think you already made those, and they are clear in the record. For the reasons previously stated, first the Court finds there to be no – well, all the reasons were race neutral as to members that were struck by the district attorney's office. And so the, the Court finds there to be no **Batson** violation.
> And then as to the other issues, the Court has already ruled that based on prior rulings from the United States Supreme Court and the State of Mississippi that jury selection was appropriate.
> As I say, they are noted for the record.
> MS. STEINER: Allow us to state into the record there is one of 12 – of fourteen jurors, are non-white, whereas this county is approximately, what, 40 percent?
> MR. BAUM [defense counsel]: The county is 40 percent black.
> THE COURT: I don't know about the racial makeup, but I will note for the record there is one regular member of the panel that is black, African-American race.

¶207. On appeal, Pitchford asserts that the State's race-neutral reasons are pretextual for each of the four African-American jurors who were struck. Further, Pitchford asserts that the State accepted white venire members who shared the characteristics of the jurors who were struck.

*Linda Ruth Lee*

76

¶208. The State said that Lee was struck because she was fifteen minutes late, "has mental problems," and police had made numerous calls to her house, according to Police Captain Carver Conley. However, Conley was not called to testify. Further, the State did not introduce any evidence to prove the claims of her having "mental problems" or of police having numerous calls to her house. The State also failed to define "mental problems" as it pertains to Lee's alleged inability to serve as a juror. With regard to Lee being fifteen minutes late, the record establishes that several jurors were late returning from lunch during voir dire. The trial court inquired why Lee was the last of the late jurors to return and she indicated that she had to walk to the courthouse. During the challenges for cause, the State tried unsuccessfully to get the trial court to strike Lee for cause for being fifteen minutes late. In denying the State's request, the trial court said:

> She indicated – and if anybody was having to walk from their house to the courtroom in this weather today, she indicated – ordinarily I would but when I asked her she said she was having to walk. And that's – you know, I guess we all assume everybody has got a way to ride now but she didn't. So I feel like that she explained the reason why she was late to the satisfaction of the court that I do not believe it would be appropriate to strike her for cause. In fact, she is trying real hard to be here and fulfill her civic duty as a juror.

¶209. There is nothing in the record to support the State's proffered race-neutral reasons for striking Lee. Further, the trial court specifically found that Lee being fifteen minutes late returning to the courthouse in what was apparently inclement weather was an insufficient reason to strike her. The characteristics cited are unrelated to the facts of the case. The majority states, "[t]hat a juror 'obviously has mental problems' was clearly a race neutral reason." (Maj. Op. at ¶ 23). I note that these alleged "mental problems" were not sufficiently obvious to compel the trial court to strike Lee for cause. The State never brought

77

up any "mental problems" or police calls prior to or during voir dire. The State did not individually voir dire Lee or ask any specific questions related to these reasons. The State also did not disclose any of this information obtained outside of the voir dire process prior to the **Batson** hearing. In **Mack v. State**, 650 So. 2d 1289, 1299 (Miss. 1994), this Court indicated that the prosecutor may not withhold such information. "That is not to say, however, that the prosecutor may, with impunity, withhold information concerning a prospective juror which impacts upon the juror's ability to be fair and impartial." **Id**. This Court also said:

> The failure to *voir dire* usually comes in to [sic] play when the prosecutor expresses some suspicion or uncertainty about the true situation involving the juror, such as when he "believes" that the juror is related to a criminal, or has been involved in some activities which might engender a negative attitude toward the defendant. This factor is closely related to the lack of an evidentiary basis. Here, the fact that Mitchell was unemployed was reflected in the jury questionnaire. The prosecutor was not acting on a mere suspicion. Still, *voir dire* on this issue may have revealed an explanation for this status which would not have been consistent with assumptions regarding the stability and community values of the unemployed. The failure to conduct *voir dire* must weigh against the State in an evaluation of the bona fides of the proffered reason.

*Mack*, 650 So. 2d at 1298.

¶210. Because Pitchford has met the burden of establishing pretext based on the indicia set out previously herein, I would find that the trial judge's acceptance of the State's race-neutral reason for striking Lee is clearly erroneous. Further, as stated by the majority, the U.S. Supreme Court reiterated in **Snyder v. Louisiana**, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008), that the Constitution prohibits striking even a single juror for a discriminatory

78

purpose. Therefore, Pitchford's conviction should be reversed and remanded for a new trial. Nevertheless, I will briefly discuss the remaining jurors.

*Christopher Lamont Tillmon*

¶211. The State said that Tillmon was struck because he said on his jury questionnaire that he had a brother who had been convicted of manslaughter. While this is an acceptable race-neutral reason, the questionnaire also indicated that Tillmon is an employed college graduate who previously worked for a correctional facility, and who strongly favored the death penalty. Further, the record indicates that the State did not voir dire Tillmon on this reason. Also, white venire members with family members who had felony, albeit nonhomicide, convictions were accepted by the State.

*Patricia Anne Tidwell*

¶212. The State said that Patricia Anne Tidwell was struck because her brother was convicted of sexual battery and was charged in a shooting case. The State also said that Tidwell is a known drug user. While Tidwell's questionnaire did indicate her brother had been convicted of sexual battery, the State offered no evidence of Tidwell's brother being charged in a shooting case or of Tidwell being a known drug user. The record indicates that the State did not individually voir dire Tidwell or ask any specific questions regarding any of these reasons. The record also indicates that white venire members with family members who had been convicted of crimes were not challenged.

*Carlos Ward*

¶213. The State said that Carlos Ward was struck because he had no opinion on the death penalty, had a two-year-old child, had never been married, and had numerous speeding

violations. Specifically, the State said that Ward was "too closely related to the defendant" because of shared characteristics. However, the record indicates that the State accepted numerous white venire members sharing the characteristics given as the basis for the challenge. The record also indicates that the State did not individually voir dire Ward on any of the proffered reasons. With regard to his opinion on the death penalty, Ward did not indicate during voir dire that he had any issue with it, but merely circled no opinion, which was the middle of five choices on the jury questionnaire  The jury questionnaire specifically excludes traffic violations, and the State introduced no evidence of any speeding violations. There is also nothing in the record to establish that the State sought information regarding traffic violations on other jurors. Further, Ward indicated he was employed and had finished two years of college at the time he completed the questionnaire.

¶214. Although the record before this Court establishes that the trial court's decision accepting the State's race-neutral reasons for excluding African-Americans from the jury was clearly erroneous, the majority states that it "cannot say the trial judge abused his discretion" with regard to each juror. (Maj. Op. at ¶¶ 21, 23, 25, 27). Rather than address the merits of this issue, the majority discusses moot aspects of the issue, as stated previously herein, and then cites various cases for the erroneous proposition that Pitchford somehow waived his *Batson* objection by not rebutting the State's proffered race-neutral reasons.

¶215. The majority finds that "[a]lthough the appellant devoted a considerable portion of his brief and oral argument before this Court to his pretext argument, he did not present these arguments to the trial court during the voir dire process or during post-trial motions." (Maj. Op. at ¶ 28). Further, the majority finds since the "appellant provided the trial court no

rebuttal to the state's race-neutral reasons" that "[w]e will not now fault the trial judge with failing to discern whether the state's race-neutral reasons were overcome by rebuttal evidence and argument never presented." (Maj. Op. at ¶ 30). Finally, the majority dismisses Pitchford's argument regarding the totality of the facts as an "attempt to present his pretext argument in another package" and finds that Pitchford "failed to provide any argument concerning pretext during the *Batson* hearing." I disagree for several reasons.

¶216. Black's Law Dictionary defines pretext as: "Ostensible reason or motive assigned or assumed as a color or cover for the real reason or motive; false appearance, pretense. . . ." *Black's Law Dictionary* 1187 (6th ed. 1990). Based on the very definition of pretext, Pitchford made a pretext argument by virtue of his *Batson* objection. When Pitchford attempted to reassert his objection, the trial court correctly found that the objection was already on the record.

¶217. To reiterate, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97. "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id*. at 98. In other words, once Pitchford made a prima facie showing, the burden shifted to the State to rebut the prima facie showing with a race-neutral explanation as to each juror. *Id*. at 97-98. Pitchford may rebut the State's evidence, but there is no requirement under *Batson* that Pitchford *must* then rebut the rebuttal before the trial court. Pursuant to *Batson*, once the State offered race-neutral reasons to rebut the prima facie showing, the trial court then made a determination that

81

Pitchford had not established purposeful discrimination. This Court is reviewing the trial court's decision to determine whether it is clearly erroneous or contrary to the overwhelming weight of the evidence. *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007).

¶218. I do not dispute the language in the cases cited by the majority regarding the basis for the trial court's decision. However, the suggestion that this Court cannot review the trial court's decision under the totality of the relevant facts is contrary to the applicable law. An analysis of the cases cited by the majority for the waiver proposition is illuminating. The majority quotes *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999), for the following: "It is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver." (Maj. Op. at ¶ 29 n. 16). *Manning* cites *Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994), which cites *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1989), for this proposition. However, *Whitsey*, which is not binding authority on this Court, makes no such finding.

¶219. The trial and hearing on the motion for new trial in *Whitsey* occurred prior to the *Batson* decision. *Whitsey*, 796 S.W.2d at 710. Following the *Batson* decision, the Texas Fourteenth Court of Appeals remanded for a *Batson* hearing. The trial court found that the defendant did not rebut the State's explanations, did not prove by a preponderance of evidence that the State had engaged in purposeful discrimination, and was not denied the equal protection of the law by the prosecutor's use of his peremptory challenges. *Id*. at 712. The Fourteenth Court of Appeals affirmed. *Id*. On appeal, the Court of Criminal Appeals of Texas reversed, finding that the defendant had established that the prosecutor had

82

exercised peremptory challenges based solely on race and that the defendant had been denied due process in the jury selection process. *Whitsey*, 796 S.W.2d at 716.

¶220. In the instant case, the majority also cites *Woodward v. State*, 726 So. 2d 524, 533 (Miss. 1997), for the following: "In the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point." (See Maj. Op. at ¶ 29 n. 16). *Woodward* is quoting *Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990), which cites *Davis v. State*, 551 So. 2d 165, 172 (Miss. 1989), for this holding. However, *Davis* is relying on the inapplicable, pre-*Batson* cases of *Jones v. State*, 306 So. 2d 57, 58 (Miss. 1975), and *Pennington v. State*, 437 So. 2d 37, 39 (Miss. 1983). Both *Jones* and *Pennington* involved issues regarding a trial court's refusal to permit the appellant to make an offer of proof to preserve testimony. *Jones*, 306 So. 2d at 58; *Pennington*, 437 So. 2d at 39. *Woodward* also cites *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991), which says the defendant "is allowed to rebut the reasons" offered by the State. *Bush*, 585 So. 2d at 1268.

¶221. Pitchford preserved the issue for appeal by making a *Batson* objection. The trial court properly found that he had established a prima facie case and required the State to provide race-neutral reasons. The trial court then made its determination, and Pitchford appeals that determination. Pitchford is not attempting to present an issue that was not first presented to the trial court. The majority cites no authority to establish that Pitchford should be precluded from relying on evidence contained in the record and presented to the trial court during voir dire, as opposed to extraneous evidence. Therefore, Pitchford has not waived this issue.

¶222. Further, an issue concerning a defendant's right to a fair trial and a prospective juror's right not to be excluded on account of race cannot be ignored pursuant to a procedural bar. The United States Supreme Court has recognized the significance of this issue. In ***Powers v. Ohio***, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed.2d 411 (1991), the Court said:

> We hold that the Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.

*Id*. at 409. The Court further said: "The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. ***Batson***, 476 U.S. at 86, 106 S. Ct., at 1717. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee." *Id.* at 411. "Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom." *Id*. at 413.

> The statutory prohibition on discrimination in the selection of jurors, 18 U.S.C. § 243, enacted pursuant to the Fourteenth Amendment's Enabling Clause, makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution. The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition.

*Id*. at 416.

¶223. For the reasons stated herein, I would find that the trial court's decision was clearly erroneous. Because I would reverse the trial court pursuant to ***Batson***, I respectfully dissent.

**KITCHENS, J., JOINS THIS OPINION.**

# APPENDIX

## <u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Goff v. State,* 14 So. 3d 625 (Miss. 2009).

*Wilson v. State,* 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State,* 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

i

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## <u>ON SENTENCING PHASE ONLY</u>

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* ***Wiley v. Mississippi***, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.